John H. MARCHESE,
Plaintiff-Appellant,

v.

MOORE–McCORMACK LINES, INC.,
Defendant and Third-Party
Plaintiff-Appellee,

v.

COURT CARPENTRY & MARINE
CONTRACTOR CO., INC., Third-Party Defendant-Appellee.

No. 821, Docket 75–7022.

United States Court of Appeals,
Second Circuit.

Argued April 14, 1975.

Decided Aug. 25, 1975.

Irving B. Bushlow, Brooklyn, N. Y., for plaintiff-appellant John H. Marchese.

Arthur I. Miltz, New York City (Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, New York City, on the brief), for defendant and third-party plaintiff-appellee Moore-McCormack Lines, Inc.

Raymond C. Green, New York City (Herbert Lasky, New York City, on the brief), for third-party defendant-appellee Court Carpentry & Marine Contractor Co., Inc.

Before KAUFMAN, Chief Judge, and SMITH and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

On this appeal from a judgment entered November 7, 1974 in the Eastern District of New York, Anthony J. Travia, *District Judge,* confirming the report of a magistrate and dismissing the complaint of a lasher and marine carpenter who sought damages for injuries sustained while unlashing pipes stowed on the main deck of a vessel, the issues are

whether the findings below that the vessel was not unseaworthy and that plaintiff's negligence was the sole cause of his injuries were clearly erroneous. We hold that they were. Accordingly, we reverse and remand for a new trial.

### I.

The following facts, as proven at a non-jury trial before a magistrate on the issue of liability[1], are substantially undisputed, except as otherwise indicated.

On August 17, 1970, John H. Marchese was employed as a lasher and marine carpenter by Court Carpentry & Marine Contractor Co., Inc. (Court Carpentry). He was injured that day while working aboard the S.S. Mormacglen which was owned and operated by Moore-McCormack Lines, Inc. (shipowner).

The vessel, a large ocean going steamer, lay moored at Pier 23rd Street Terminal in Brooklyn. She had come from Brazil. She had on deck as cargo four long steel pipes which had been loaded and lashed to the deck in Brazil. They were each 20 feet long and 4 feet in diameter. Three of the pipes were stowed on wooden sleepers. The fourth was on top of two of the other pipes, those nearest No. 5 hatch. The length of all of the pipes ran fore and aft between the hatch coaming and the vessel's solid steel bulwark or rail. The deck sloped toward the bulwark. There was about 18 inches of space between the pipes and the hatch coaming and about the same space between the pipes and the bulwark.

The pipes were secured with lashing wires in three places. One lashing was at each end of the pipes and one was in the center. The lashings went over the pipes from the bulwark to the coaming. Each lashing was secured to the deck with a turnbuckle attached to a padeye. The end of the lashing which passed through the eye of the turnbuckle was clamped with two clips. Each clip was held in place by two bolts and nuts.

At about 9 A. M. on August 17, Marchese was directed by a snapper (assistant foreman), also employed by Court Carpentry, to unlash the pipe cargo at No. 5 hatch on the inshore side. He was told to work quickly because a longshore gang was standing by waiting to unload the cargo. He started at the forward end of the pipes near the bulwark. Using a ratchet wrench, he released two of the three lashing wires by removing the nuts from the clips which held together the ends of the lashing wires.[2] He was working on the third lashing wire at the after end of the pipes, having loosened the first nut from the clip, when the pipes shifted and pinned him against the bulwark. Immediately before the pipes shifted, he had been working in the 18 inch space between the pipes and the bulwark, with his back toward the bulwark. He sustained injuries to his knees and back for which he sought damages in the district court.

It is undisputed that the pipes as stowed had neither chocks nor crib to hold them in position. They were held in position only by the lashing wires. It

1. By stipulation, the non-jury trial on the issue of liability was held before Magistrate Vincent A. Catoggio on April 29, 1974. Pursuant to Fed.R.Civ.P. 53, the magistrate on September 24, 1974 filed his report setting forth his findings and conclusions. Following the filing of plaintiff's objections to the report, Judge Travia on October 18, 1974 heard motions to confirm and to reject the report. He confirmed the report from the bench that day. On November 7, 1974, a judgment was entered dismissing the complaint against the shipowner.

The judgment also dismissed the shipowner's third-party complaints which had sought indemnification against the stevedore and against plaintiff's employer.

2. There was another method by which the lashing wires could have been released—by turning the turnbuckle itself and continuing to turn it until the entire length of the turnbuckle thread had been unscrewed. This was a slower method which would have released the tension of the lashing wires more gradually than the method used by Marchese.

834

also is undisputed that before releasing the lashing wires Marchese did not look to see if the pipes were chocked or otherwise held in position.

The magistrate found that the vessel was not unseaworthy and that the sole cause of Marchese's injuries was his own negligence. The district court confirmed the magistrate's report. From the judgment dismissing his complaint, Marchese appeals.

## II.

We turn first to the finding that the vessel was not unseaworthy.

■ It is common ground that a shipowner is required to furnish a safe place to work for seamen, longshoremen and harbor workers. This duty is absolute and non-delegable. *Mahnich v. Southern Steamship Co.,* 321 U.S. 96, 102 (1944). A shipowner's liability for unseaworthiness essentially is a "species of liability without fault . . . . Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character." *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94 (1946). Seamen and others who work on a vessel must "accept without critical examination and without protest, working conditions and appliances as commanded by [their] superior officers", and they do not assume the risk of working under such conditions. *Mahnich v. Southern Steamship Co., supra,* 321 U.S. at 103. Nor is a shipowner who provides an unseaworthy vessel relieved of liability because the unseaworthiness is attributable to the negligence of a fellow servant of the injured person rather than to the shipowner's negligence. *Id.* at 101–02. It is true that an isolated negligent act of a fellow servant which causes an injury may not render a vessel unseaworthy. *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 500 (1971). But where such a negligent act brings into play an unseaworthy condition, a shipowner will be held liable. *Crumady v. The Joachim Hendrik Fisser,* 358 U.S. 423 (1959). And any contributory negligence on the part of an injured worker which brings into play an unseaworthy condition does not bar recovery; rather, the degree of contributory negligence is ground only for mitigation of damages. *Socony-Vacuum Oil Co. v. Smith,* 305 U.S. 424, 429 (1939). See *Rivera v. Farrell Lines, Inc.,* 474 F.2d 255, 257 n. 1 (2 Cir.), *cert. denied,* 414 U.S. 822 (1973).[3]

■ The unseaworthiness of the vessel in the instant case was the stowage of the pipes without chocks or crib. Such stowage was dangerous to anyone releasing the lashings. The place for the lashers to work was not reasonably safe. The danger from pipes which were unchocked and otherwise unsupported except for the lashing was that they were sure to roll once they were unlashed. Especially since they were stowed on a sloping deck in pyramid formation with the top pipe exerting pressure on the lower ones, movement of the unchocked pipes was inevitable once unlashed. In short, the improperly stowed pipes constituted unseaworthiness. See *Scott v. S.S. Ciudad Ibaque,* 285 F.Supp. 613, 616 (E.D.La.1968), *aff'd,* 426 F.2d 1105 (5 Cir. 1970).

In *Palazzolo v. Pan-Atlantic S.S. Corp.,* 211 F.2d 277 (2 Cir. 1954), *aff'd sub nom. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.,* 350 U.S. 124 (1956), where large rolls of paper pulp had been loaded aboard the vessel without having been properly chocked, we affirmed in part and reversed in part the judgment in favor of the plaintiff, who was injured by one of the rolls which jumped the dunnage and struck him. In upholding the finding of unseaworthiness because

**3.** The 1972 amendment to the Longshoremen's & Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) (Supp. III, 1973), which provides that a shipowner may be held liable to a longshoreman only for negligence, not for unseaworthiness, is not applicable here, since the accident occurred on August 17, 1970.

of the unchocked rolls of paper, we stated:

"Since it is reasonably foreseeable that improper stowage must result in rolls of pulp sliding or 'jumping' and striking someone, the ship would be liable for this accident if the jury found, as it did here, that the accident resulted from improper stowage. *La Guerra v. Brasileiro,* 2 Cir., 124 F.2d 553. Proper stowage is an element of seaworthiness. *Pioneer Import Corp. v. The Lafcomo,* 2 Cir., 138 F.2d 907." 211 F.2d at 279.

Evidence of unseaworthiness in the stowage of the pipes in the instant case was adduced through the testimony of Nicholas Martino, plaintiff's expert. Martino had been a marine carpenter for some 24 years, during part of which he had worked as a snapper. Martino's uncontroverted testimony established that the pipes could not have been stowed on deck in pyramid formation at the time they were loaded and before they were lashed *unless they had been chocked or otherwise restrained from spreading by stanchions and braces or a crib.* He described in detail the proper method of chocking or cribbing and lashing pipes after loading them on a vessel. Martino specifically testified that, in his opinion, the pipes here involved were not properly secured; that the lashing was inadequate properly to secure the pipes to go to sea; and the pipes never would have moved or shifted if they had been secured with wood chocks or braces. With respect to the chocking of the pipes at the time they were loaded, Martino testified:

"When the pipes were loaded, there had to be chocks there to support the pipes, in other words, those pipes would have been rolling around all the time because there would have been no way to control them unless there were chocks there."

█ We hold that the finding below that the vessel was not unseaworthy was clearly erroneous.[4]

## III.

█ The corollary to our holding that the court below was clearly erroneous in finding that the vessel was not unseaworthy is that it also was clearly erroneous in finding that Marchese's negligence was the sole cause of his injuries. Having so held, normally it would be unnecessary for us to go further.

Since we are remanding for a new trial, however, we believe it is appropriate briefly to comment on the claim of contributory negligence for the guidance of the court and the parties on remand.

First, we find that much of the shipowner's argument addressed to the issue of seaworthiness actually goes to the issue of the degree of contributory negligence, if any, rather than to seaworthiness.[5] For example, we believe that the shipowner's massive reliance is misplaced, in seeking to negate the claim of unseaworthiness, in relying upon its argument that release of the lashing by undoing the turnbuckles rather than removing the nuts from the clips was the better and safer method. Having held as we have that improper stowage of the pipes rendered

4. In view of our holding on the issue of unseaworthiness, it is unnecessary for us to reach appellant's alternative claim that it was not Marchese, but his fellow servant, Alphonse Anderson, who released the last of the three lashing wires. This claim, as well as others, may be urged at the new trial on remand.

5. We have carefully considered the shipowner's principal claim that, since Marchese's negligence was the sole cause of his injuries, the vessel was not unseaworthy. For the reasons stated, we reject this claim. This is not a case such as *Baker v. S/S Cristobal,* 488 F.2d 331, 333 (5 Cir. 1974), where "[a]t the most, it can be said only that, engaged in a plan of operation that was safe, the plaintiff chose to employ a particular method that was unsafe, and this does not render the vessel unseaworthy." Nor is this a case like *Pisano v. S. S. Benny Skou,* 346 F.2d 993, 995 (2 Cir.), *cert. denied,* 382 U.S. 938 (1965), or *Sotell v. Maritime Overseas Inc.,* 474 F.2d 794 (2 Cir. 1973), where the alleged unseaworthiness and resulting injuries were caused solely by the negligence of the party injured. In the instant case, underlying all was the condition of unseaworthiness due to improper stowage of the pipes.

clearly erroneous the finding that the vessel was not unseaworthy, the short answer to the shipowner's claim regarding the better method of releasing the lashing is that it goes to contributory negligence and not to seaworthiness. The same applies to the shipowner's claims that Marchese should have looked to see if the pipes were chocked and that he should have positioned himself where the pipes would not roll against him.

■ Second—again for guidance on remand—we find that the record fails to support the shipowner's claim, even on the issue of contributory negligence, that use of the turnbuckle to release the lashing would have prevented injury to Marchese under the circumstances here present. There was no evidence, for example, that unscrewing the turnbuckle so as to release the first two lashings would have reduced the danger of the pipes rolling. The pipes presumably would have remained in place until the third lashing was released. Even if the third lashing was released by unscrewing the turnbuckle, there was no evidence that at a certain point the forces which would cause the pipes to spread would

6. See note 7, *infra.*

7. Nor do we find support for the shipowner's essential contention in the testimony of Marchese or his fellow servant Anderson.

Marchese testified as follows on cross-examination:
"Q. So, if you gradually turned the turnbuckle, the lashing would have allowed for the gradual spreading of the pipes until the bulwark would not allow the pipes to move any further, is that correct?
A. You are talking about if I had, but I did not do this.

Q. Sir, I'm asking you a question, isn't that correct?
A. That's right."
\* \* \*
"Q. Had you used a turnbuckle, the movement would have been very slow, if there was any movement at all, is that correct?
A. That's right."
Anderson also testified as follows on cross-examination:
"Q. Sir, if you used a turnbuckle, you would have gradually loosened the lashing, isn't that so?

not have been sufficient to have caused the clips to pop off, which is what happened when the lashings were released by removing the nuts from the clips. Also for consideration on remand, we note again that Marchese was told to work quickly because a longshore gang was waiting to unload the cargo. Anderson, a fellow servant of Marchese, specifically testified that it would have taken more time to use the turnbuckle.[6]

Moreover, we find no support in the record for the shipowner's contention that, if the turnbuckles for all three lashings were gradually unscrewed so that no one lashing was bearing all of the tension, the pipes would roll so gradually that there would be no force left to cause them to roll suddenly and pin a workman against the bulwark. Indeed, such evidence as there was on this point certainly does not support the shipowner's hypothesis. When Martino was asked about it, he replied,

"I don't know, but it's got to shift, it's got to shift as soon as you take the turnbuckle's tension off, it's going to shift. I don't know if it will be gradual or not."[7]

A. You can loosen it that way, but it would have taken more time.
Q. [By the magistrate] Would it have released the lashing more slowly?
A. Yes, it would have.
Q. Also, you would not have had to climb on top of the pipe, isn't that correct?
A. Yes."

On the basis of this testimony, the shipowner asserts that by the time the turnbuckles had been fully unscrewed the pipes would have come to rest gently against the bulwark and the coaming and no further movement, much less sudden movement, would have been possible since all the tension would be off the lashings.

Here again, for aught that appears in the record before us, this assertion does not appear to be warranted. In order to determine whether the pipes in fact would spread gradually until the bulwark and coaming would not allow them to move further, it would be necessary to calculate the amount of open space between the pipes and the bulwark on one side and between the pipes and the coaming on the other; then it would be necessary to determine how far along the deck the pipes would roll before the tension of the lash-

We hold that the finding below that Marchese's negligence was the sole cause of his injuries was clearly erroneous.

We reverse the finding that the vessel was not unseaworthy. On all other issues we reverse and remand for a new trial. We assume that the new trial will be to the court.

Reversed and remanded.

ing was entirely released after the turnbuckles were entirely unscrewed, adding 36 inches to the curved length of the wire extending from the deck up over the eight foot pile of pipes; and finally it would be necessary to determine the speed at which the pipes would roll in any remaining open space, taking into account such factors as the pressure exerted against the pipes, the angle of the deck, and other relevant data.

We leave this to be determined by the court on remand as part of the shipowner's claim of contributory negligence.