**AMERADA HESS CORPORATION (HESS OIL & CHEMICAL DIVISION), Ocean Towers Ltd. and Hess Oil Virgin Islands Corp., Plaintiffs-Appellants,**

v.

**S/T MOBIL APEX, her engines, boilers, etc.**

**and**

**Mobil Tankers Limited, Defendants-Appellees and Cross-Appellants.**

No. 665, Dockets 78–7525, 78–7551.

United States Court of Appeals, Second Circuit.

Argued March 9, 1979.

Decided July 23, 1979.

As Modified on Denial of Rehearing Oct. 18, 1979.

---

James H. Simonson, New York City, Bigham Englar Jones & Houston, New York City, for plaintiffs-appellants.

John S. Rogers, New York City (Burlingham Underwood & Lord, New York City, Christopher H. Johnson, New York City, of counsel), for defendants-appellees and cross-appellants.

Before SMITH, MANSFIELD and MULLIGAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

These are cross-appeals from a judgment entered in the United States District Court for the Southern District of New York, Marvin E. Frankel, *Judge*, exonerating Mobil Tankers Limited ("Mobil") and the S/T MOBIL APEX from liability for damage to a cargo of gasoline and naphtha, and awarding Mobil a general average contribution of $219,034.78 plus interest from Amerada Hess Corporation ("Amerada"). Amerada appeals the finding of no liability, while Mobil contests the omission from general average of $40,000 expended in settlement of a claim for salvage services. We affirm the finding as to liability but reverse the determination of the amount of the judgment.

On April 17, 1969, Amerada chartered the S/T MOBIL APEX, owned by Mobil, to carry a cargo of gasoline and naphtha from St. Croix, Virgin Islands, to New York. On April 29, shortly after loading of the cargo had begun, the crew discovered that naphtha was leaking into the engine room, through a bulkhead penetration through which the bilge pump shaft passed from the engine room to the pump room. Personnel on and off the ship were notified of the leak, and loading of the cargo ceased immediately. Nevertheless, sparks from machinery in the engine room ignited the leaking naphtha, causing an explosion and fire.

Initial efforts to extinguish the fire were unsuccessful. With the consent of the ship's master, two tugs, owned by Ocean Towers Limited ("Ocean Towers") and chartered by Hess Oil Virgin Islands Corporation ("Hess V.I."), towed the MOBIL APEX away from the dock. Coast Guard personnel then were able to extinguish the fire.

In this admiralty action against Mobil and the MOBIL APEX, Amerada sought to recover damages for the loss of a portion of the gasoline and naphtha cargo, and Ocean Towers and Hess V.I. demanded payment for the salvage services provided by their tugs. Mobil denied liability and counterclaimed for a general average contribution under the terms of the charter party. Prior to trial, Mobil settled the claim for salvage services by paying $40,000 to Ocean Towers and Hess V.I., without prejudice to its claim that this amount should be included in general average.

The district court adopted the finding of the magistrate who heard the case as a special master, that Mobil did not breach the warranty of seaworthiness and thus should be exonerated from liability for damage to the cargo. The court also adopted the special master's recommendation that Mobil should recover in general average against Amerada, but the court, without explanation, excluded from general average the $40,000 paid in settlement of the salvage claim.

Amerada attacks the district court's conclusion that the MOBIL APEX was seaworthy. Amerada concedes that the naphtha initially flooded the pump room because of negligence of shipboard personnel, who were under its control as charterer. It contends, however, that the leakage of naphtha from the pump room to the engine room resulted from the unseaworthiness of the vessel.

Five pumps in the pump room of the MOBIL APEX were connected with their power sources in the engine room by means of rotating power shafts which penetrated the bulkhead between the two compartments. Each of these penetrations was sealed by a "stuffing box" (also called a "gland"). The ability of a stuffing box to provide a satisfactory seal depends on the type of packing material used and the tightness of this packing material around the shaft. The stuffing boxes that surrounded the four cargo pump shafts contained three rings of asbestos packing material. No naphtha leaked through these four shaft openings. The bilge pump shaft, however, was protected by a stuffing box which contained two turns of felt packing. It was through this bilge pump shaft opening that naphtha leaked into the engine room.

■ Section 3(1)(a) of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1303(1)(a), imposes on a shipowner a duty to exercise due diligence to make the vessel seaworthy. The standard of seaworthiness requires that the ship be reasonably fit for the use intended. *The Silvia*, 171 U.S. 462, 464, 19 S.Ct. 7, 43 L.Ed. 241 (1898); *Nichimen Co. v. M. V. Farland*, 462 F.2d 319, 332 (2d Cir. 1972). When a vessel is chartered to carry a liquid cargo, it must be equipped to store and transport the fluid safely. *Coca Cola Co. v. SS Norholt*, 333 F.Supp. 946, 948-49 (S.D.N.Y.1971).

■ Experts testified that it is impossible to design a usable stuffing box that would be liquidtight at all times. Such a seal would require the packing to be so tightly compressed that it would interfere with the rotation of the pump shaft. It is possible, however, to construct a stuffing box that is gastight at all times and that may be adjusted, *i. e.*, tightened, to become liquidtight when the pump is not in operation. The district court concluded that application of the seaworthiness standard to this case required that the stuffing boxes possess this "latent liquidtight integrity." The court reasoned that when the pumps are in operation, a watchful crew will be present in the pump room to detect any leaks and take steps to prevent seepage into the engine room. But when the pumps are not operating and crew members are most likely to be away from the pump room, the stuffing boxes should be capable of being

tightened to prevent an unnoticed leak. The parties, despite some quibbling over the wording of the standard, do not contest its applicability, and we agree that it represents the proper test for seaworthiness in these circumstances. Amerada contends, however, that the special master and the district court erred in concluding that the standard had been met.

Amerada's primary argument is that testimony by the chief engineer, that he attempted unsuccessfully to stop the flow of naphtha by adjusting the stuffing box, demonstrates conclusively that the stuffing box lacked latent liquidtight integrity. Mobil responds that the engineer did not attempt this adjustment until after the naphtha had begun leaking through the untightened stuffing box, at which time the packing already had become saturated, thus making the attempted adjustment fruitless. Amerada retorts that Mobil's assertion that the packing had become saturated is "sheer speculation" and that, in any event, a stuffing box which cannot be adjusted after being saturated cannot be termed liquidtight.

The evidence presented as to the design of the stuffing box supports a logical inference that the naphtha flowing through the untightened stuffing box had saturated the packing by the time the leak was discovered and the adjustment attempted. We cannot agree with Amerada's contention that a stuffing box that loses its ability to be effectively tightened once it is saturated must be held to lack latent liquidtight integrity. As we stated above, the purpose for the requirement of latent liquidtightness is to prevent leakage when the pumps are inoperative and the crew is away from the pump room. This can be accomplished if the crew tightens the stuffing box before leaving the pump room unattended. The standard of seaworthiness does not require that the stuffing box be designed to prevent leakage where the crew fails to take this precaution, if in fact such a design would be possible.

The remainder of Amerada's argument on appeal consists of disagreements as to the credibility of witnesses and the weight that their testimony should be accorded. There is no doubt that the testimony offered was in sharp conflict as to the utility of felt as a packing material and the ability of the bilge pump stuffing box to be adjusted. But there was substantial credible evidence from which the court could conclude that the stuffing box possessed latent liquidtight integrity. Although much of the testimony in this case was in the form of deposition transcripts, a number of the depositions were taken in the presence of the special master, who therefore had an opportunity to observe the demeanor of the witnesses. After giving due regard to our equal ability to appraise testimony of other witnesses whom the special master did not observe, we see no reason to reject the conclusion reached by the special master and the district court that the MOBIL APEX was seaworthy.

Mobil's cross-appeal presents the question whether an expenditure incurred for salvage services performed without a written contract, but with the consent of the ship's master, should be included in general average. The concept of general average "is simply stated—when one who partakes in a maritime venture incurs loss for the common benefit, it should be shared ratably by all who participate in the venture." *Sea-Land Service, Inc. v. Aetna Insurance Co.*, 545 F.2d 1313, 1315 (2d Cir. 1976). The contract of carriage between Mobil and Amerada incorporated the York-Antwerp Rules of 1950, Rule A of which provides:

> There is a general average act when, and only when, any extraordinary sacrifice or expenditure is intentionally and reasonably made or incurred for the common safety for the purpose of preserving from peril the property involved in a common maritime adventure.

Rule A would appear to encompass the expenditure at issue here. The master of the ship intentionally incurred the obligation by consenting to the towage. Amerada does

not contend that it was unreasonable to settle the claim for salvage services for $40,000. And lastly, the towage was for the common safety of the ship and cargo. By eliminating the need for concern about possible damage to lives and property on shore or aboard other ships near the dock, it allowed full attention to be devoted to saving the ship and its cargo.

■■■ Amerada argues, however, that salvage services "performed by a volunteer, not under contract, can never satisfy Rule A." (Plaintiffs-Appellants' reply brief, at 17.) This formulation accurately states the law as to "salvage charges," which result from "the voluntary act on the part of a total stranger to the adventure and without a contract of any kind, as for example, when a derelict vessel is picked up by another vessel and towed into port." L. Buglass, Marine Insurance and General Average In The United States at 209 (1973). In such a case, the charges are not "intentionally . . . made or incurred" by anyone associated with the voyage and thus cannot constitute general average. But Ocean Towers and Hess V.I. hardly can be termed "volunteers," although they performed without a written contract. The master of the MOBIL APEX intentionally and voluntarily agreed to accept their towage services. Thus, reasonable compensation for the services provided comes within the terms of Rule A, as well as the principle set forth in E. Congdon, General Average at 106 (2d ed. 1923):

> The amount paid for successful services rendered to a disabled vessel and her cargo by salvors, *when such services are engaged or accepted by the master* to save the adventure from an imminent common peril, is apportioned as general average in the same manner as any other extraordinary disbursement voluntarily incurred for the common benefit. (Emphasis added.)

Although one treatise asserts that such expenses should be considered "salvage charges" and thus not be included in general average, R. Lowndes & G. Rudolf, The Law of General Average and The York-Antwerp Rules at 122 (10th ed. 1975), no authority is cited to support this assertion.

■■■ In the absence of any precedent interpreting Rule A to exclude such expenses, we choose to follow the straightforward language of the Rule. We therefore hold that the $40,000 paid in settlement of the salvage claim should have been included in the calculation of general average.[1]

Finding of no liability of ship affirmed. Remanded for recalculation of damages in general average in accordance with this opinion.

---

1. Our conclusion comports with the 1974 version of the York-Antwerp Rules. Rule VI provides:

> An expenditure incurred by the parties to the adventure on account of salvage, *whether under contract or otherwise*, shall be allowed in general average to the extent that the salvage operations were undertaken for the purpose of preserving from peril the property involved in the common maritime adventure. (Emphasis added.)

Although the 1950 Rules, which govern here, do not contain any such provision dealing specifically with salvage, there is no indication that the addition of Rule VI was meant to alter previous law in this regard. Rather, it was introduced "to ensure greater international uniformity and simplification" by eliminating a practice among British adjusters, who, unlike adjusters elsewhere, "on a few isolated occasions felt obliged to differentiate between general average and salvage, and apportion them separately and over different values." R. Lowndes & G. Rudolf, The Law of General Average and the York-Antwerp Rules at 644 (10th ed. 1975). Rule VI simply makes clear that, to the extent an expenditure for salvage satisfies the usual criteria for determining general average, it in fact should be considered an element of general average.