**GTS INDUSTRIES S.A.,**
**Plaintiff–Appellee,**

v.

**S/S "HAVTJELD", her engines, tackle, boilers etc., in rem, Defendant,**

**K/S Havtjeld, A/S Havtor Management, A/S Bulkhandling, in personam, Defendants–Appellants.**

**No. 1146, Docket 94–7885.**

United States Court of Appeals, Second Circuit.

Argued Feb. 6, 1995.

Decided Nov. 1, 1995.

1532

Chester D. Hooper, New York City (A. Andrew Tsukamoto, Haight, Gardner, Poor & Havens, New York City, of counsel), for Defendants–Appellants.

David L. Mazaroli, New York City, for Plaintiff–Appellee.

Before: KEARSE, CARDAMONE, and MAHONEY, Circuit Judges.

CARDAMONE, Circuit Judge:

We have before us a dispute between a shipper and a shipowner regarding cargo which, after reaching its destination and upon being unloaded from the ship, was discovered to be damaged. Total repair costs for the damages and survey fees amounted to $212,827.12, for which amount the shipper brought suit. After a bench trial held in the United States District Court for the Southern District of New York (Carter, J.), the shipper obtained a decision awarding it $188,526.76 plus interest against the shipowner which, when reduced to a judgment dated August 4, 1994, totaled $244,542.37. From this judgment, the shipowner appeals. For the following reasons, we affirm.

## FACTS

The cargo in question consisted of 1,660 pieces of steel pipe sheathed in an external polyethylene coating and ten externally bare pipes. Each of the pipes was 40 feet long, 36 inches in diameter, and weighed between three and six tons. The pipes were manufactured in Germany by the plaintiff shipper GTS Industries S.A., (GTS, plaintiff or shipper), a French corporation engaged in the business of manufacturing and selling steel pipe. The pipes were purchased by Transcontinental Gas Pipe Line Corporation (Transco) to be laid as part of a natural gas pipeline in Texas. Because the pipe was to be laid in the ground it was sheathed in a three-layer coating to protect it from corrosion that could cause it to break down. The first layer applied against the bare metal was an epoxy fusion bond, over which was placed a layer of adhesion material, and the third layer, on the surface of the pipe, was a polyethylene wrap. The pipes had beveled ends to facilitate welding when they were installed. Before being shipped they were tested and inspected, at which time the coating and bevels were found to be in good condition and in compliance with contractual specifications.

As shipper, GTS had chartered the S/S Havtjeld from defendants, the ship's owners, K/S Havtjeld, A/S Havtor Management, and A/S Bulkhandling (collectively shipowner or defendant) to carry the steel pipe from Dunkirk, France to Philadelphia, Pennsylvania. The shipper paid $452,270 to defendant to carry and deliver the cargo in April 1991. The parties executed a charter party March 14, 1991 that described the cargo as coated steel pipe. The shipowner warranted the S/S Havtjeld was suitable to load, transport and discharge the cargo and warranted further that its ship was "in every respect fitted to perform the voyage." The terms of Clause 2 of the charter party made the shipowner responsible for cargo damage caused by negligent or improper stowage and for failure to exercise due diligence to make the vessel seaworthy in all respects.

Shipment was tendered to defendant on April 2, 1991 at Dunkirk. GTS had agreed in Clause 5(b) of the charter party to load, stow and secure the pipe aboard the Havtjeld "free of any risk, liability and expense whatsoever to the Owners." GTS and Transco had five surveyors at Dunkirk for the loading. It was their job to inspect the cargo prior to and during that process. The pipes were stowed aboard without any protective covers or wrapping. Defendant's chartering manager and Port Captain, Ingar Aakerman, who was in charge of the pipe shipment, was also present at the loading. Only those damages to the coating of the pipes that equalled or exceeded three millimeters in depth were repaired in Dunkirk. Defendant's officers found the cargo in good condition, except for 17 pieces that were damaged. Defendant issued a bill of lading that reflected these facts.

Although there was evidence that the vessel pitched and rolled heavily during the ocean voyage, the trip was uneventful. None of the cargo shifted and no hatch leaked. GTS had agreed to sell the coated pipe and to transfer title and risk of damage to the cargo after Transco had inspected and accepted the pipe upon its arrival in Philadelphia. In accordance with the terms of the charter party, discharge was performed by the shipowner using the S/S Havtjeld's cranes and employing hired stevedores. Transco determined after the pipes were off-

loaded that over 80 percent of them were so damaged as to require repair.

Those persons present at the unloading noticed pieces of rust scale that had fallen on the pipe, apparently from the overheads of the cargo holds during the voyage. The cargo surveyor reported that the largest percentage of coating damage came from this rust scale as the pipes moved with the ship's pitching and rolling during its voyage. Some of the pieces of rust sifted into lower tiers of the stow and gouged the pipe as it was moved upon unloading. Further damage to the coated steel pipes was caused when wooden saddles used by the stevedores in Philadelphia to support the pipes during off-loading—so-called "Napoleon Hats"—turned out to have protruding nails. A number of the beveled pipe ends were also injured when the stevedores banged them about during offloading. Additional damage was caused by loose nails and glass that had been left in the cargo hold after loading.

As a result plaintiff GTS was required to expend $172,300.36 to repair the coating damage, of which $130,000 was attributable to rust scale and $26,000 to the faulty "Napoleon Hats." Damage to the pipes' beveled ends due to the stevedores' rough handling on discharge came to $28,896. Survey fees and other costs brought GTS' total claim to $212,827.12, the amount sued for in the instant action.

The trial court held the shipowner liable for the amounts expended by GTS to repair the pipes, discounting the repairs necessitated by damage from loose nails and glass in the holds, which was not attributable to the defendant. Noting that the shipper bears the burden of establishing that the damage to the goods was proximately caused by the defendant's breach of the charter party, the trial court determined that the cargo left Dunkirk in good condition but needed extensive repairs upon its arrival in Philadelphia. To determine the amount of repairs attributable to the various causes, it relied on the testimony of one Carney, a surveyor working on behalf of the cargo underwriters. Defendant appeals from the judgment entered by the district court in favor of GTS.

## DISCUSSION

The vessel owner contends the trial court erred in two respects. First, the shipowner argues that the district court misanalyzed the owner's duty to ensure the seaworthiness of the vessel. Clause 4 of the charter party provided that the vessel's holds are to be "properly swept, cleaned and dried at Owners' expense to Charterers' satisfaction." Clause 4 also stated that the S/S Havtjeld was "in every respect suitable for the loading transportation and discharge of the cargo" and "in every respect fitted to perform the voyage."

According to the shipowner, the district court seized on the words in Clause 2, "to make the vessel in all respects seaworthy," and ruled that this amounted to an express warranty by the shipowner to provide a seaworthy ship. While the trial court recognized an owner may delegate the duty to load, stow and secure cargo, the shipowner's argument continues, it failed to realize that under a charter party the duty to furnish a seaworthy ship can also be delegated. It points to language in the district court's opinion that states: "the duty to provide a seaworthy ship is a duty the shipowner cannot delegate," as support for this argument.

Moreover, the owner maintains, the district court refused to acknowledge that the owner had delegated to the shipper the duty to examine and determine the suitability of the S/S Havtjeld's holds that carried the steel pipe. The district court concluded such a delegation was prohibited, the owner continues, by applying principles of the Carriage of Goods by Sea Act (COGSA), see 46 U.S.C. app. § 1300 et seq. (1988), rather than ordinary contract law principles, although it and the parties agree that the governing contract of carriage in this case was the charter party, not COGSA.

The second error, the shipowner asserts, is that the burden of proof to show the cargo's condition at loading and the cause of damage to the cargo was improperly placed on the owner. We address the shipowner's contentions in turn.

**I  Delegation to Shipper**

### A. *Warranty of Seaworthiness in Maritime Law*

Some historical background will help put the legal issues before us in context. Over 100 years ago, before the passage of the Harter Act of 1893, 27 Stat. 445 (codified at 46 U.S.C. app. § 190 *et seq.* (1988)), a shipowner warranted that its ship was seaworthy when her voyage began. At that time such warranty was absolute. Over the years owners had attempted to limit their own and their vessel's liability by inserting provisions in bills of lading limiting losses arising from their ships' unseaworthiness. The Harter Act was passed to bring a halt to the relaxation of responsibility imposed on shipowners. Section 2 of that Act made it unlawful to lessen an owner's obligation to use due diligence to equip and outfit a vessel properly or to make it seaworthy and capable of performing her intended voyage. Section 3 of the same Act provided that if the owner exercised due diligence to make a vessel seaworthy, it would not be liable for latent defects not discoverable by diligent examination. *See The Southwark*, 191 U.S. 1, 6–8, 24 S.Ct. 1, 3, 48 L.Ed. 65 (1903).

The burden of proof to show due diligence in providing a seaworthy ship is, of course, on the owner because of its superior knowledge of what diligence was used compared to the shipper, which has none. *See Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 783 (2d Cir.1946) (L. Hand, J.). Seaworthiness is defined as "the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes." *McAllister Lighterage Line, Inc. v. Insurance Co. of North America*, 244 F.2d 867, 870 (2d Cir.) (citing *The Silvia*, 171 U.S. 462, 464, 19 S.Ct. 7, 8, 43 L.Ed. 241 (1898)), *cert. denied*, 355 U.S. 871, 78 S.Ct. 123, 2 L.Ed.2d 76 (1957). To avoid liability for lack of seaworthiness—whether imposed by statute because the ship is a common carrier under COGSA or because liability for seaworthiness has been assumed by contract—a shipowner must prove that the loss occurred due to one of the exceptions permitted by COGSA or the carriage contract, as the case may be, and was not due to the breach of the shipowner's duty to provide a seaworthy vessel. *See Commercial Molasses Corp. v. New York Tank Barge Corp.*, 314 U.S. 104, 108–110, 62 S.Ct. 156, 159–161, 86 L.Ed. 89 (1941).

In contrast to the rule that the shipowner must show the applicability of an exception to the obligation to carry safely, a two hundred year old distinction has existed as to who has the burden of proof regarding seaworthiness. In the case of a common carrier the shipowner is statutorily so burdened, whereas under private arrangements where parties are free to regulate their rights with respect to one another, proof of the breach of obligation or duty to provide a seaworthy vessel rests upon the shipper asserting it as a basis for recovery. *See id.* at 109, 62 S.Ct. at 160; *Metropolitan Coal Co.*, 155 F.2d at 783. Because this case involves a private contract of carriage, the burden of proof, to be discussed shortly, rests upon the shipper.

### B. *No Delegation in This Case*

Analysis turns to the shipowner's first argument, that is, the district court's alleged error in failing to recognize a delegation of the duty of providing a seaworthy vessel to the shipper. We need spend little time on this point. As the above brief review of the history of the maritime law suggests, attempts to exempt a shipowner from its general obligation to furnish a seaworthy ship are strictly confined. *See Church Cooperage v. Pinkney*, 170 F. 266, 269 (2d Cir.), *cert. denied*, 214 U.S. 526, 29 S.Ct. 704, 53 L.Ed. 1068 (1909). "[T]he warranty of seaworthiness is a favorite of the admiralty and exceptions to it or limitations upon it, are narrowly scrutinized." *Metropolitan Coal Co.*, 155 F.2d at 783–84. Since the charter party required the shipowner "to make the vessel in all respects seaworthy," which includes furnishing "a ship which will carry the [cargo] without injury to it," *Church Cooperage*, 170 F. at 268, there is simply no basis to conclude that the shipowner delegated its duty to furnish a seaworthy vessel to the shipper.

To support its delegation proposition owners cite cases that involved a charter party that contained a specific provision that the shipper's acceptance of the vessel constituted a waiver of seaworthiness, *see, e.g., A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc.,* 852 F.2d 493, 497 (9th Cir.1988), or contained a clause that stated: "acceptance of [the vessel] by charterer is to be conclusive evidence of [its] seaworthy condition." *McAllister Lighterage Line,* 244 F.2d at 871. No such language of waiver is found in the charter party in the case at hand.

Further, the shipowner's argument attempts to draw support from that part of the charter party where it agreed to sweep, clean and dry the holds to the charterer's satisfaction. The shipowner seizes on this provision to urge that the shipper thereby waived its right to insist on a seaworthy vessel. We cannot agree. The provision for cleaning the holds is separate and distinct from the requirement that the owner's provide a seaworthy vessel and thus adds to the owner's responsibilities. Moreover, we rejected this same argument when it was raised by the shipowner in *Church Cooperage,* 170 F. at 269–70. The shipowner cannot rely on a provision *increasing* its responsibilities to derogate its warranty of seaworthiness.

As its final argument on delegation the carrier, relying on *Nichimen Co. v. M.V. Farland,* 462 F.2d 319 (2d Cir.1972) (Friendly, J.), insists that Captain Aakerman was acting as the carrier's agent during the loading and stowage of the steel pipe. In *Farland* the captain acted under the charterer's orders and directions during the "load, stow, and trim" of the cargo. *Id.* at 332–33. There steel coils were improperly stowed and suffered damage when they shifted during the voyage. *Id.* at 324–25. Here there was no evidence of improper loading, nor any proof that the cargo shifted at sea. The port captain of the S/S Havtjeld in Dunkirk, Captain Aakerman, represented in his testimony that he helped supervise the entire loading, stowing and lashing of the cargo. He also testified that he knew how the coated steel pipes were to be handled. In addition, the trial court imposed liability only for damage

stemming from the condition of the holds and from the offloading. This proof was sufficient to support the finding that nothing the captain did or failed to do during loading contributed to defendant's liability. *Farland* is therefore of no aid to the owner. There was therefore no delegation by the shipowner of any of its duties to the shipper.

### C. *Charter Party Ambiguity*

Defendant also advances a contention based on those terms of the charter party that purport to assign responsibility for loading and offloading cargo. Clause 2 of the charter party appears to fix "free in, liner out" (FILO) terms that defendants maintain govern the agreement. Under FILO, the shipper would be responsible to "load, secure and stow" the cargo and the shipowner would be responsible for offloading the cargo. In urging this construction of the charter party defendants concede their responsibility for the offloading damages caused by the stevedores' mishandling and by the defective "Napoleon Hats," but they insist that any damages caused by the condition of the cargo hold is the shipper's responsibility.

Clause 2 of the charter party provides: "Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods...." Clause 5(b), in apparent contradiction to Clause 2, states "the cargo shall be brought into the holds, loaded, stowed and/or trimmed by the Charterers or their Agents, free of any risk, liability and expense whatsoever to the Owners." The contradiction arises because the shipowner's responsibility for damage to the cargo or for delay in delivery arises under Clause 2 only for negligent stowage, which responsibility Clause 5(b) assigns to the shipper. The trial court refused to consider an offer of parol evidence to resolve the apparent ambiguity.

We do not find the apparent ambiguity troubling because regardless of which party was responsible for loading and stowing there is simply no proof of damage resulting from improper loading and stowage of the cargo. The district court rejected the idea

that failure to cover the pipes with plastic sheeting constituted improper stowage, holding instead that shedding rust scale was part of the cargo hold's inherent want of seaworthiness. We agree. Thus, the question of an apparent ambiguity' in the terms of the charter party is irrelevant.

The trial court further found that damages resulting from a failure to sweep up the debris in the cargo hold appeared to be "an aftermath of the loading for which defendants are not liable." This aftermath was properly accounted for by the trial court in its calculation of damages when it adopted the uncontradicted testimony of surveyor Carney that allocated repair costs attributable to each of the various causes alleged. Consequently, GTS was entitled to recover for its loss.

## II   Did Shipper Sustain Its Burden of Proof Respecting Damages?

Defendant next maintains that although the trial court recognized that under the charter party the burden of proving damage and the cause of damage is placed squarely on the plaintiff shipper, such burden was not applied. The linchpin of this argument is, according to the shipowner, that the shipper was not required to prove the amount of damage to the pipes before they were loaded aboard the S/S Havtjeld in France. The district court found that any damage to the polyethylene coating equal to or more than three millimeters deep was repaired immediately at the loading port. Some pipe was therefore loaded with coating damage of less than three millimeters. Absent proof as to the number of such pipes at loading, defendant continues, plaintiff cannot prove the amount of damage that existed at the port of discharge. This existing damage, the shipowner concludes, constituted a hidden defect for which it may not be held liable. GTS responds that the unrebutted proof at trial established that the pipe was in good condition when loaded, except for the 17 pieces noted in the ship master's exception list attached to the bill of lading.

The charterer must prove the damage for which it seeks recovery and must also prove that the damage was proximately caused by the carrier's breach of the terms of the charter party. *See Associated Metals & Minerals Corp. v. S/S Jasmine*, 983 F.2d 410, 414 (2d Cir.1993). This *prima facie* burden may be met by the shipper showing that the cargo was delivered in good condition and when unloaded was found damaged. *See Siderius, Inc. v. M.V. Amilla*, 880 F.2d 662, 664 (2d Cir.1989). The carrier then has the duty of producing proof showing that the cause of loss was not one involving its negligence. *See Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 812 (2d Cir.1971). The reason for this is that the carrier is generally in a better position than the shipper to know the cause of the loss. *See id.* at 812 (citing *Commercial Molasses Corp.*, 314 U.S. at 110–11, 62 S.Ct. at 160–61). That is, the burden of production shifts to the shipowner, but not the burden of persuasion, which remains fixed with the shipper. *See Leather's Best*, 451 F.2d at 813. When the proof respecting liability for damage remains in equipoise, the shipper's claim must fail. *S/S Jasmine*, 983 F.2d at 414.

In reaching the conclusion that the cargo was in good condition before the S/S Havtjeld departed for Philadelphia, the district court relied on the bill of lading and the testimony of Captain Aakerman. The bill of lading included an attachment of protest prepared by the ship's master that indicated that the coating on 17 of the pipes was damaged. The damage, according to that document, ranged in depth from one to three millimeters. Captain Aakerman testified that apart from "some ... minor scratches in the coating" of the pipes and a slightly flattened beveled end on one pipe, the cargo appeared to be "in good condition."

Defendant contends that it was error to consider the bill of lading, on the theory that the charter party, not the bill of lading, determines the parties' rights. It is true that a bill of lading in these circumstances operates, as a legal matter, as a receipt and not as a contract of carriage. *See The Fri.*, 154 F. 333, 337 (2d Cir.1907) ("where there is a charter party the bill of lading operates as the receipt ... and as a document of title passing the property of the goods, but not as varying the contract"), *cert.*

*denied,* 210 U.S. 431, 28 S.Ct. 761, 52 L.Ed. 1135 (1908). But that does not preclude the trial court from assigning evidentiary significance to the contents of the bill of lading. Similarly, the shipowner contends the trial judge should not have taken account of Captain Aakerman's testimony because he was acting as plaintiff's agent during the loading, not as owner's agent. This contention also lacks merit because the captain's testimony has evidentiary weight regardless of the legal relationship between the parties.

Defendant also declares that the trial judge should not have considered the bill of lading because some damage to the pipes may have come from a hidden defect that could not have been discovered by a visual inspection. Concededly, where the cargo may have deteriorated from a latent defect, the shipper must produce evidence other than the bill of lading—which in any event only describes the external appearance of the goods, or how the goods appeared to the naked eye—to show the condition of the goods prior to shipping. *See Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan,* 236 F.2d 627, 631 (2d Cir.1956). But in the present case the shipper produced uncontroverted proof that the cargo was in good condition when loaded and that it was damaged by the neglect of the shipowner—by the rust scale and the faulty "Napoleon Hats." Thus, the plaintiff went beyond merely meeting its burden of presenting a *prima facie* case of damage. The shipowner's unsupported assertion that there were cuts of less than three millimeters on an unknown number of pipes did not discharge its burden of coming forward with proof that its lack of fault was at least as probable as the existence of such fault.

Moreover, by deducting the damage indicated on the bill of lading (each instance of which was equal to or less than three millimeters in depth) and crediting Captain Aakerman's testimony, the trial judge took account of the damage occurring before the pipes were loaded at Dunkirk. Given evidence that the pipes were otherwise in good condition before they were loaded onto the S/S Havtjeld in France, the trial judge's factual determinations were not in error. Although it is conceivable that some of the coatings on the pipes had nicks of less than three millimeters that were not taken into account by the defendant's employees, the trial judge correctly allocated the burden of proof in this case.

### CONCLUSION

Accordingly, for the reasons stated, the judgment of the district court is affirmed.