**MOBIL SHIPPING AND TRANSPORTATION COMPANY, Plaintiff–Counter–Defendant–Appellee,**

v.

**WONSILD LIQUID CARRIERS LTD., Defendant–Counter–Claimant–Appellant.**

No. 98–9148.

United States Court of Appeals, Second Circuit.

Argued May 24, 1999.

Decided Aug. 30, 1999.

Manuel R. Llorca, Chalos & Brown, P.C., New York, N.Y. (Stephan Skoufalos, of counsel), for Defendant–Counter–Claimant–Appellant.

Peter H. Ghee, Waesche, Sheinbaum & O'Regan, P.C., New York, N.Y. (Richard W. Stone, II, of counsel), for Plaintiff–Counter–Defendant–Appellee.

Before: KEARSE, MINER, and McLAUGHLIN, Circuit Judges.

## BACKGROUND

McLAUGHLIN, Circuit Judge:

In late 1994, Mobil Shipping and Transportation Company ("Mosat") chartered a doubled-hulled freighter named the Alsterstern from Wonsild Liquid Carriers Ltd. ("Wonsild"). It was to transport lube oil from Europe to Hong Kong via Singapore. Under the charter contract, Wonsild warranted that the Alsterstern "shall be in good working order and condition and in every way seaworthy and fit for the carriage of the cargo" throughout the voyage.

The voyage to Singapore was uneventful. On February 9, 1995, it successfully completed the first delivery in Singapore. Then, while proceeding to another Mosat discharge berth in Singapore harbor, the Alsterstern suddenly lost power. The vessel crashed into the discharge berth. The allision left the vessel with a 30–foot long gash in her outer hull nine feet above the water line, and another 33–foot long indentation twenty feet above the water line.

Over the next couple of days, a surveyor from Germanischer Lloyd, an international ship classification society hired by Wonsild, inspected the vessel three times. The surveyor ultimately determined that the vessel was fit to continue its voyage to Hong Kong, but only if: (1) the vessel sailed at the safest possible speed; (2) the vessel sailed in favorable weather; and (3) the hull damage was monitored during the voyage.

The ship's crew also isolated what they (erroneously) believed to be the source of the sudden power loss—a broken tachometer. To remedy this perceived problem, the crew "jury-rigged" the electrical system to run off the emergency generator.

Because the vessel's navigation warning system forecasted good weather for the next four days, which was how long it would take the Alsterstern to sail to Hong Kong, the Alsterstern's captain informed Wonsild officials that he could deliver the cargo before repairing the vessel. Accordingly, Wonsild advised Mosat that the Alsterstern was prepared to proceed to Hong Kong.

Mosat was less sanguine. It told Wonsild that it was contemplating a discharge of the Hong Kong cargo in Singapore; and it instructed the vessel to remain in Singapore for further instructions. In response, Wonsild informed Mosat that: (1) Germanischer Lloyd had certified the vessel as seaworthy to continue the voyage; (2) immediate repairs were not required; and (3) if Mosat instructed Wonsild to offload the oil and effectuate repairs, it would

do so, but Mosat would have to bear the costs associated with temporarily storing and insuring the cargo.

Mosat then gave Wonsild a choice. Wonsild could either: (1) abandon the voyage and face the consequences of breaching the contract; or (2) repair the vessel while storing the cargo at Wonsild's risk and expense during the repair period. Insisting that the vessel was seaworthy, Wonsild refused to repair it.

Mosat directed Wonsild to have the remaining oil discharged in Singapore. Mosat paid the full freight as if the cargo had been transported to Hong Kong. It also incurred additional expenses to off-load the oil in Singapore, store it, and obtain another vessel to transport it to Hong Kong.

One week later, the engineers repairing the Alsterstern discovered the actual cause of the sudden power loss—faulty insulation in one of the pressure switches that controlled the regular generator.

Mosat commenced a breach of contract action in the United States District Court for the Southern District of New York (Martin, J.). Mosat alleged that Wonsild breached the charter contract by failing to maintain the vessel in seaworthy condition throughout the voyage. Mosat sought to recover the expenses it incurred securing alternate carriage for its cargo.

In its defense, Wonsild argued that: (1) it did not breach the contract because the Alsterstern was seaworthy; and (2) even if the vessel was unseaworthy, Wonsild could not be held liable because the unseaworthiness resulted from a latent defect. Wonsild also counter-claimed, seeking payment of demurrage and port expenses incurred during the delay in Singapore.

Following a two-day bench trial, the district court issued an Opinion and Order holding that Wonsild breached its contractual warranty that the Alsterstern would be seaworthy throughout the voyage. While volunteering that the vessel would be seaworthy if it was transporting a be-nign liquid cargo, such as milk, the court concluded that a heightened standard of seaworthiness applied because the ship was carrying lube oil, a hazardous substance. Under this heightened standard, the vessel was not seaworthy and Wonsild thus breached the charter contract. The court awarded Mosat approximately $277,-000 in damages and prejudgment interest. Judge Martin did not address Wonsild's latent defect defense.

Wonsild now appeals, arguing that the court: (1) erred when it held that the Alsterstern was not seaworthy; and (2) failed to address Wonsild's latent defect defense.

## DISCUSSION

### Seaworthiness

Wonsild raises two arguments to support its position that the vessel was seaworthy. First, it contends that Judge Martin's finding is against the weight of the evidence. In the alternative, Wonsild asserts that Judge Martin applied an incorrect legal standard to determine whether the vessel was seaworthy. Specifically, Wonsild asserts that Judge Martin was wrong to consider the cargo's hazardous nature when evaluating whether the Alsterstern was seaworthy.

### A. Standard of Review

On appeal from a bench trial, the district court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*. *See Lopresti v. Terwilliger*, 126 F.3d 34, 38–39 (2d Cir. 1997). Under the clear error standard, we "may not reverse [a finding] even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Rather, a finding is clearly erroneous only if "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction

that a mistake has been committed." *Id.* (internal quotations omitted).

Second Circuit jurisprudence concerning the appropriate standard of review for a district court's finding of seaworthiness is in a state of flux. In *In re Marine Sulphur Queen*, 460 F.2d 89, 97–98 (2d Cir. 1972), we held that a conclusory finding of seaworthiness (as distinguished from the evidentiary facts upon which the finding is based) is not entitled to the benefit of "clearly erroneous" review. Rather, the finding is "entitled to great weight and will ordinarily stand unless the lower court manifests an incorrect conception of the applicable law." *Id.* However, our more recent cases suggest that a district court's finding of seaworthiness is reviewed for clear error. *See Raphaely Int'l, Inc. v. Waterman Steamship Corp.*, 972 F.2d 498, 503 (2d Cir.1992); *Marchese v. Moore-McCormack Lines, Inc.*, 525 F.2d 831, 835 (2d Cir.1975).

We need not settle this controversy today. Under either the "clearly erroneous" standard or the less-deferential standard of *Marine Sulphur Queen*, Judge Martin reached the correct conclusion.

B. *Seaworthiness*

■ To support its contention that the vessel was seaworthy, Wonsild points to: (1) the opinions of Germanischer Lloyd, Captain Kahns, the Master of the vessel, and the vessel's hull underwriters and owners that the vessel was seaworthy; and (2) the decision of the Singapore Port Authorities to allow the vessel to move about the port. Wonsild contends that Judge Martin's determination cannot stand in the face of this evidence. We disagree.

■ A vessel is seaworthy when it "is reasonably fit to carry the cargo which she has undertaken to transport." *The Silvia*, 171 U.S. 462, 464, 19 S.Ct. 7, 43 L.Ed. 241 (1898); *see, e.g., GTS Indus. S.A. v. S/S "Havtjeld"*, 68 F.3d 1531, 1535 (2d Cir. 1995) ("Seaworthiness is defined as 'the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes.'") (quoting *McAllister Lighterage Line, Inc. v. Insurance Co. of North Am.*, 244 F.2d 867, 870 (2d Cir.1957)); *Nichimen Co. v. M.V. Farland*, 462 F.2d 319, 332 (2d Cir.1972) ("One essential aspect of seaworthiness is that the vessel must be fit for the purpose intended under the charter party."); *R.T. Jones Lumber Co. v. Roen Steamship Co.*, 270 F.2d 456, 458 (2d Cir.1959) (seaworthiness "means not only the reasonable ability of a ship to meet the anticipated conditions of the sea but its ability to carry safely the cargo which it has accepted for shipment"). Where, as here, the parties contract to transport liquid cargo, we have defined "seaworthiness" to require that the vessel "be equipped to store and transport the fluid safely." *Amerada Hess Corp. v. S/T Mobil Apex*, 602 F.2d 1095, 1097 (2d Cir.1979).

Viewed in its entirety, the record contains ample evidence to support Judge Martin's conclusion that the vessel was not seaworthy. The Alsterstern had experienced an unexpected loss of power and would have been undertaking a 1400 mile voyage on the open sea with a jury-rigged electrical system that relied on the emergency generator. Besides that, the vessel had two major gashes in its outer hull. *See Commercial Transp. Corp. v. Martin Oil Serv., Inc.*, 374 F.2d 813, 817 (7th Cir.1967) (vessel unseaworthy when it had a "35–foot by two-inch hole in the hull . . ., causing gasoline to escape therefrom"). Given these obvious infirmities, and the conflicting opinions of the parties' expert witnesses, Judge Martin did not err when he concluded that the vessel was not "reasonably fit to carry the cargo which [Wonsild had] undertaken to transport." *The Silvia*, 171 U.S. at 464, 19 S.Ct. 7.

■ Wonsild's alternative contention, that Judge Martin could not consider the heightened risk associated with transporting oil when making his seaworthiness determination, is similarly unpersuasive. In this environmentally-sensitive era, consid-

eration of the potential environmental impact of a disaster comports with modern notions of what goes into the "seaworthiness" calculus.

The Supreme Court has defined seaworthiness as whether a vessel is "reasonably fit to carry the cargo which she has undertaken to transport." *Id.* By adopting a "reasonably fit to carry the cargo" standard, the Court has indicated that the district court should consider the nature of the vessel's cargo when determining whether the vessel can reasonably perform its intended duties.

■ Similarly, we have noted that "seaworthiness" requires the vessel to be able to transport the liquid cargo "safely." *Amerada Hess Corp.*, 602 F.2d at 1097; *R.T. Jones Lumber Co.*, 270 F.2d at 458. Common sense counsels that "safe" transport encompasses not only the vessel's ability to protect the cargo's integrity, but also its ability to transport the cargo without threatening the environment.

Finally, commentators have noted that "[t]he term 'seaworthy' has no absolute meaning, but varies with the circumstances and exceptional features of the case known to both parties." Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d.* § 99:25, at 99–36 (1997); *see* 1 Raoul Colinvaux, *Carver's Carriage by Sea* § 152, at 118 (13th ed.1982). Given the broad, fact-specific determination that the district court must make, Judge Martin did not err by considering the hazardous nature of the cargo as a relevant factor within the seaworthiness inquiry.

### Latent Defect

Wonsild next contends that even if the vessel was unseaworthy, Wonsild cannot be held liable because the allision resulted from a latent defect. Wonsild asserts that the contract: (1) excluded damages arising from latent defects; and (2) incorporated the Hague–Visby Rules, which also exclude liability for latent defects. Wonsild claims that Judge Martin's failure to make factual findings regarding this defense, at the very least, necessitates a remand under Fed.R.Civ.P. 52(a). Alternatively, Wonsild asserts that if we decide to address the latent defect issue, we should reverse Judge Martin and order judgment to be entered in Wonsild's favor because its latent defect argument is dispositive.

### A. Remand

■ Judge Martin's failure to make factual findings regarding the latent defect defense does not require a remand. Although Federal Rule of Civil Procedure 52(a) obligates a district court to "find the facts specifically and state separately its conclusions of law thereon" following a bench trial, Fed.R.Civ.P. 52(a), a district court's non-compliance with Rule 52 does not necessarily deprive this Court of the ability to conduct intelligent appellate review. *See, e.g., Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 850 (2d Cir.1992). Rather, we may review the district court's decision "if we are able to discern enough solid facts from the record to permit us to render a decision." *Davis v. New York City Hous. Auth.*, 166 F.3d 432, 436 (2d Cir.1999) (citing *Tekkno Labs., Inc. v. Perales*, 933 F.2d 1093, 1097 (2d Cir.1991)); *see Stetson*, 955 F.2d at 850; 9A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure, *Civil 2d* § 2577, at 522–27 (1995). Because the relevant evidence is documentary and undisputed, we can render a decision on the basis of the present record.

### B. Latent Defect

■ Wonsild's alternative argument, that the latent defect excused its breach under the charter contract, is unpersuasive. Section 20(a) of the charter contract provides that Wonsild "shall not ... be responsible for *any loss or damage to cargo* arising or resulting from ... any latent defect in hull, equipment, or machinery." It is undisputed that there was no loss or damage to the cargo in this case. Because the contract does not limit Won-

sild's liability for failing *to deliver* the cargo, Wonsild's reliance on this contract provision is misplaced.

■ Wonsild's second argument, that the charter contract incorporates the Hague–Visby Rules under which Wonsild would be excused from non-performance, is similarly off the mark. True, the Hague–Visby Rules apply. Wonsild, however, can derive little comfort therefrom.

The "Clause Paramount" of the charter contract between the parties provided that the contract shall be subject to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300 *et seq.,* unless the bill of lading was issued in a country that recognized the Hague–Visby Rules in which case those Rules would trump COGSA. The bill of lading was issued in England, a country that has adopted the Hague–Visby Rules. *See* The Carriage of Goods by Sea Act 1971 (1971 c 19), *reprinted in* E.R. Hardy Ivamy, *Carriage of Goods by Sea* 325 (13th ed.1989).

■ Article VI, Section 2 of the Hague–Visby Rules provides that "[n]either the carrier nor the ship shall be responsible for loss or damage arising or resulting from ... (p) Latent defects not discoverable by due diligence." *Id.* Art. VI, § 2(p), at 330. The term "loss or damage" in the Hague–Visby Rules "is not limited to physical loss or damage [to the cargo]. The only limitation is that the loss or damage must arise in relation to the loading, handling, stowage, carriage, custody, care, and discharge of such goods." Sir Alan A. Mocatta *et al. Scrutton on Charter Parties* 448 (19th ed.1984). Thus, a carrier or ship may assert a latent defect defense under the Hague–Visby Rules where, as here, it fails to deliver the goods to their final destination, even though the goods themselves are not damaged. *See The Hellenic Dolphin* [1978] 2 Lloyd's Rep. 336 QBD (Admiralty Court); Ivamy, *Carriage of Goods by Sea,* at 170; Colinvaux, *Carver's Carriage by Sea* §§ 457–58, at 311–13.

■ The mere existence of a latent defect, however, does not ipso facto terminate liability either under COGSA, *See M. Golodetz Export Corp. v. S/S Lake Anja,* 751 F.2d 1103, 1110 (2d Cir.1985), or under the Hague–Visby Rules. The traditional rules of proximate cause apply. Accordingly, the Hague–Visby Rules excuse the carrier's breach only when the loss "aris[es] or result[s] from" the latent defect. Ivamy, *Carriage of Goods by Sea* 330; *see* Colinvaux, *Carver's Carriage by Sea* § 217, at 168 (under Hague–Visby, "[a]n exception covers loss proximately caused by the excepted peril"). As under the analogous rules of COGSA, the carrier must "affirmatively show that the immediate cause of the damage was an excepted cause for which the law does not hold him responsible." *Schroeder Bros. v. The Saturnia,* 226 F.2d 147, 149 (2d Cir.1955) (citations omitted); *cf. GTS Indus. S.A. v. S/S "Havtjeld",* 68 F.3d 1531, 1535 (2d Cir.1995) ("a shipowner must prove that the loss occurred due to one of the exceptions permitted by COGSA or the carriage contract").

Even assuming that the defect in the electrical system was a "latent defect," Wonsild cannot show the requisite causal nexus between that defect and the loss. Wonsild was given the option of repairing the vessel before continuing the voyage. The necessary repairs would have taken only nine "good weather working days." App. at 517. Wonsild, therefore, could have off-loaded and stored the oil, repaired the vessel, and completed delivery to Hong Kong within the thirty days remaining under the charter contract. Rather than make immediate repairs, Wonsild insisted that the Alsterstern was seaworthy despite its obviously damaged state. Wonsild's decision not to repair the vessel was a superseding, intervening act breaking the chain of causation that is necessary to excuse its failure to perform its contractual obligations. *Cf. Sedco, Inc. v. S.S. Strathewe,* 800 F.2d 27, 33 (2d Cir.1986). Wonsild was required "to take arms against the

sea of troubles and by opposing end them." William Shakespeare, *The Tragedy of Hamlet, Prince of Denmark* act III, sc. 1, ll. 59–60 (Tucker Brook & Jack R. Crawford eds., rev. ed., Yale University Press 1947). This it did not do.

### CONCLUSION

We have considered all the arguments raised by appellant and find them to be without merit. Accordingly, the judgment of the district court is AFFIRMED.