**A/S DAMPSKIBSSETSKABET TORM, Plaintiff,**

v.

**UNITED STATES of America, Defendant. (3 Cases)**

Nos. 97 Civ. 7518 LAK, 98 Civ. 0393 LAK, 98 Civ. 4087 LAK.

United States District Court, S.D. New York.

Sept. 9, 1999.

James H. Hohenstein, Haight Holland & Knight, New York City, NY, James M. Textor, Cichanowicz, Callan, Keane, Vengrow & Textor, LLP, New York City, NY, for A/S Dampskibssetskabet Torm.

David W. Ogden, Acting Assistant Attorney General, Janis G. Schulmeisters, Attorney in Charge, NYFO, Mary Jo White, United States Attorney, Debra J. Kossow, United States Department of Justice, for the United States of America.

## OPINION

KAPLAN, District Judge.

This case arises out of a dispute concerning a charter party for the carriage by plaintiff, A/S Dampskibssetskabet Torm ("Torm"), of jet fuel from Kuwait to Japan for the defendant's agency, the Military Sealift Command (the "MSC"). Contamination was detected in the course of loading the cargo. The government terminated the contract for default, which gave rise to three lawsuits, all brought by Torm. The first seeks a determination that the government's termination was wrongful and converting the termination into one for the convenience of the government. The second is Torm's claim for cancellation damages, demurrage, lost profits and out-of-pocket expenses resulting from that termination. The third seeks recovery of demurrage arising from the MSC charter of plaintiff's vessel, the TORM LILLY which is undisputed but has been withheld by the government. The government counterclaimed in the first and second actions for a determination that the termination for default was proper and in the third action for damages resulting from the degradation of the jet fuel.

The parties agreed to a trial on a stipulated record consisting of depositions, exhibits and other evidence. These are the

Court's findings of facts and conclusions of law based on that stipulated record.

### Facts

*The Contract*

Torm is a Danish company in the business of ocean cargo transport. On September 19, 1996, the MSC awarded Torm contract N62387–96–C–1425 (the "Contract") to carry approximately 240,000 barrels of JP8 jet fuel (the "Cargo") purchased by the Defense Fuels Supply Center from the Kuwait National Petroleum Company ("KNPC") from Kuwait to Japan.[1] Bradley D. Taylor was the contracting officer at the MSC. Although the Contract was initially for Torm's vessel, the TORM GOTLAND, the parties agreed to substitute the NEPTUNE CRUX (the "Vessel").[2]

The Contract specified that the commencement date was September 27, 1996.[3] That is, the Vessel was to arrive, ready to load, on that date "in clean, gas free condition and be ready for internal tank inspection by [the government's] quality assurance representative."[4] In the event that the Vessel arrived after September 30, the MSC was entitled to cancel the Contract.[5] The Contract provided also for 72 hours of laytime—the amount of "free" time the MSC had to load and unload the Cargo.[6] To the extent the process took longer without any fault of the Vessel, the MSC was required to pay Torm $17,000 per day in

---

**1.** Pre–Trial Order ("PTO"), § III, ¶ 1 (All subsequent references to the PTO, unless otherwise indicated, are to Section III, which contains stipulations of fact.); *see* DX A (the Contract). The Contract utilizes a standard tanker voyage charter form—MSC TANKVOY 92—which was adopted by the MSC in 1992. Taylor Dep. 42. MSC TANKVOY 92 consists of two parts: Part I supplies terms unique to the contracting parties. Part II consists of standard provisions. In this case, several documents, which together supply all of the unique terms, compose Part I. Taylor Dep. 99–100. During the deposition of Bradley Taylor, the MSC's contracting officer, the parties marked these several documents as exhibits a through g. The Court refers to these exhibits as different sections—a through g—of DX A, corresponding to the scheme the parties used during Taylor's deposition.

The parties do not dispute that the Contract is subject to the rules set forth in the Federal Acquisition Regulations, 48 C.F.R. § 1.301 *et seq.* (1998).

**2.** PTO ¶ 2.

**3.** DX A § a (second page).

**4.** PTO ¶ 3; DX A § a (second page).

**5.** DX A § a (second page), and § g, at 12. According to the terms of the contract, the MSC could terminate 24 hours after the cancellation date. To effectuate cancellation, the MSC was required to give notice of such termination. *Id.*

**6.** Taylor Dep. 93; *see also* DX A § a (third page).

demurrage, a form of liquidated damages.[7] The Contract made no mention of any date by which the Vessel was to leave Kuwait or by which it was to arrive in Japan.

Relevant also to this dispute is Section E1 of the MSC's standard charter party (the "Inspection Clause"), which states in pertinent part that:

"The Vessel and her hull; machinery; boilers; all tanks, holds, voids, spaces and equipment ... shall be subject to Charterer's inspection as to suitability for the required service prior to acceptance of the Vessel and at any time during the currency of this Charter Party. The Charterer's inspector(s) shall have the right at loading and discharging ports and places to inspect the Vessel and observe operations. ... If in the opinion of the Charterer's inspector any deficiency or condition exists which renders the Vessel inadequate for the required service, the Charterer shall have the option to cancel this Charter Party at no cost to the Government or to require any necessary corrective actions."[8]

*Pre–Loading Events*

Prior to its loading on board the Vessel, the Cargo was stored in KNPC onshore fuel tank number 533.[9] On September 12, James McCargo, a Quality Assurance Representative ("QAR") for the government, sampled that fuel to ensure that it met United States military specifications.[10] Test results from the KNPC laboratory[11] reflected that the fuel met those specifications, that is, it was "on-spec."[12] Based on those results, Christian Sluder, the government's QAR for the loading attempts pertinent to this case, issued a certificate of quality concerning the tank's contents.[13] The integrity of the fuel in tank no. 533 is not in question—the parties agree that no fuel entered or left tank no. 533 between September 12 and September 29, 1996.[14] Moreover, on September 29, samples of tank fuel were drawn and tested to ensure that the fuel had not stratified, or separated, while in the tank. That test revealed that the fuel, in fact, had remained homogenous.[15] Also tested on September 29 were samples taken from the pipeline that was to be used in transferring the Cargo from tank no. 533 to the Vessel. Those tests revealed that the fuel in the line was on-spec.[16]

Meanwhile, the Vessel steamed toward Mina Al Ahmadi, Kuwait. Prior to arrival, the Vessel's crew engaged in an extensive cargo tank cleaning program.[17] On the evening of September 29, the Vessel arrived in port and tendered its notice of readiness ("NOR"),[18] which indicated that

7. DX A § a (third page).

8. *Id.* § g, at 8.

9. PTO ¶ 37.

10. Sluder Decl. 5. McCargo tested the fuel in tank no. 533 in connection with the anticipated loading of cargo onto a different vessel which never occurred. *Id.*

11. All tests conducted at or before the time of loading were done at the KNPC laboratory by KNPC personnel. PTO ¶ 15.

12. *Id.* ¶¶ 38–39.

13. *Id.* ¶ 40.

14. *Id.* ¶ 41.

15. Sluder Decl. 6.

16. *Id.* at 11; Brown Dep. 63–66; DX P, II. Sluder testified that, although he did not witness the drawing of the pipeline sample, he witnessed its testing in the KNPC laboratory. Sluder Decl. 10. The samples taken on September 29 were drawn by KNPC personnel. Sluder Dep. 97. Sluder explained that the "contract between KPC and DFSC requires KNPC to take a sample of the shore line before loading begins ... to insure that cargo delivered to the vessel meets the specifications." Sluder Decl. 9. There is no persuasive evidence that it was witnessed by anyone.

17. *See* PX 81; Kooi Decl. 5; Miranda Dep. 18–19, 22–28.

18. PTO ¶ 4.

the Vessel had arrived and was in condition ready to load the Cargo.

The first order of business was the pre-loading inspection of the Vessel's cargo tanks. Sluder represented the MSC in this process.[19] Ian Brown, representing SGS Kuwait, an independent surveyor notified by the KNPC, attended as an independent cargo inspector.[20] Brown and Sluder boarded the Vessel and each inspected half of the Vessel's cargo tanks.[21] According to Kevin Miranda, chief mate of the Vessel at the time, Sluder said that the tanks "were in very, very good condition" and that he was "quite happy with the condition of the [tank's] coating ... [and] the cleanliness of the tank."[22] Nevertheless, the parties have stipulated that there was a thin layer of carbon soot on some of the surfaces of the tanks,[23] although there is no evidence that the MSC was cognizant of it, and Sluder denied that he was aware of any soot or that he was told by the crew of its presence.[24] The loading of the Cargo was approved subject to the subsequent analysis of first foot samples,[25] which involved loading a small portion of fuel into the cargo tanks and then testing the purity of that fuel to ensure that no latent contaminants inside the tanks would contaminate the Cargo.[26]

*The Loading Attempts*

Following the inspection, the Vessel was directed to berth[27] and commenced filling its cargo tanks with inert gas, a process that was completed by 1600 hours on September 30.[28] Loading of the Cargo for the purpose of obtaining first foot samples commenced around midnight and samples then were drawn from the Vessel's cargo tank 4C.[29] The sampling point on the Vessel was at the end of a standpipe connected to the tank. As the sample was drawn, rust from the standpipe flaked off into the sample container, so the Vessel's crew provided a screen to help remove the particles.[30] These and all subsequent samples were drawn by the SGS Kuwait surveyors who also witnessed their testing by the KNPC laboratory technicians.[31] Sluder claims that he witnessed them as well.[32]

Analysis of the foot samples revealed that the jet fuel aboard the Vessel was off-spec. The military specifications for JP8

19. *Id.* ¶ 9.

20. *Id.* ¶ 8. An independent surveyor acts as an independent witness to the quality and quantity of cargo supplied by the manufacturer, here the KNPC. Although not affiliated with the manufacturer, the surveyor is hired by it. Brown Dep. 19–20. There are several recognized independent surveying companies, including SGS Kuwait, Caleb Brett, Inspectorate, Saybolt and Charles Martin. John Dep. 71; Battie Dep. 107.

21. PTO ¶ 69.

22. Miranda Dep. 36–42. Despite defense counsel's strenuous objections during the testimony, the statement is admissible as non-hearsay pursuant to FED.R.EVID. 801(d)(2)(D). Miranda testified that he was in charge of "all the loading, discharge and tank cleaning and over and above maintenance of the vessel." Miranda Dep. 14.

23. PTO ¶ 32.

24. Sluder testified that while he literally performed a white glove test during the inspection, swiping the tank walls to check for "any

dust, rust, scale or other deposits ..., this becomes moot after a few moments since gloves cumulatively pick up dirt on any surface touched, such as access ladders, structural members, etc." Sluder Decl. 7.

25. PTO ¶ 12; DX F.

26. *See* Sluder Decl. 8; John Dep. 33; Brown Dep. 27, 134–35.

27. PTO ¶ 13.

28. DX P. This process reduces the oxygen level in the tanks creating an inert, or nonexplosive, environment. Kwang Dep. 30.

29. Brown Dep. 44–49.

30. Sluder Decl. 12. According to Sluder, no alternative method of drawing samples was provided. *Id.*

31. *Id.* at 9; Brown Dep. 52–54; John Dep. 19; DX HH (John field notes).

32. Sluder Decl. 9.

required that the fuel contain a maximum of 1 mg/liter of particulate matter and that the filtration time for one gallon not exceed 15 minutes.[33] The test of the sample from cargo tank 4C revealed particulate matter of 1.6 mg/L and a filtration time of 26 minutes.[34] Consequently, the MSC ordered that the loading, which had been proceeding while the samples were tested, be discontinued. More samples were drawn, including one from the shore pipeline. Although the laboratory filtration pads for this sample were brown/rust in color,[35] the pipeline sample tested on-spec.[36] Sluder then ordered the loading to resume, hoping that the particulate problem could be overcome by diluting the off-spec fuel on board the Vessel with more on-spec cargo.[37] This attempt, however, proved futile. All four additional foot samples subsequently drawn—one from each of three different tanks and a composite sample of the three—were off-spec.[38]

Following these events, Brown on October 2 issued a "Notice of Apparent Discrepancy" to the Vessel's master, which advised Torm that the defendant declined to load further cargo due to "high 'Particulate Matter.'"[39] The master contested the results listed in the notice, recording at the bottom that the "evidence [is] not conclusive that [the] particles are from [the Vessel's] tanks."[40]

At that point, the KNPC ordered the Vessel to vacate its berth. Meanwhile, the Vessel's master telexed Taylor and informed him that the Vessel did not contaminate the Cargo and that it was reserving the right to claim against any and all parties for all time lost, i.e., demurrage, as a result of the incident.[41] Taylor responded to the situation by offering Torm three alternatives, which were relayed through Torm's ship broker.[42] In pertinent part, alternative one was for the Vessel to flush the contaminated cargo through the piping and out of the cargo tanks in an effort to rid the Vessel of any additional contaminant. Alternative two was for the Vessel to discharge the cargo already on board and cancel the voyage. Alternative three was to proceed with alternative one, but with the opportunity to cancel the voyage if the flushing proved unsuccessful.[43] Torm chose the first,[44] hoping to proceed with the voyage. On October 4, the Vessel discharged all of the previously loaded cargo. The DFSC sold it back to the KNPC for a loss of $2,630.[45]

Despite the failure of the Vessel to pass inspection after the first loading attempt and Sluder's recommendation that the cargo tanks be re-cleaned prior to a second, the MSC did not require that the Vessel

---

**33.** PTO ¶ 31. The filtration and particulate matter tests consist of pouring one gallon of fuel through a filtration pad. Filtration time is simply the amount of time this process takes. Particulate matter is the difference in weight of the filtration pad before and after the test. DX G at 13–15.

Plaintiff objects in the pretrial order to certain exhibits containing the KNPC laboratory test results as reported for lack of foundation and/or authentication. PTO, at 48. But Torm stipulated that the KNPC in fact reported the results set forth in the exhibits. Brown Dep. 50; John Dep. 13. It raised no hearsay objection. Hence, its objection to these exhibits is overruled.

**34.** DX II.

**35.** Sluder Dep. 220–21.

**36.** PTO ¶ 33 (the test yielded particulate matter of 0.55 mg/L and a filtration time of 9 minutes).

**37.** Sluder Decl. 13.

**38.** PTO ¶ 33.

**39.** *See* DX M.

**40.** *Id.*

**41.** Taylor Decl. 7; DX T.

**42.** DX V at 1; Taylor Decl. 7–8.

**43.** DX V at 1; Taylor Decl. 8.

**44.** DX V at 2; Taylor Decl. 9.

**45.** DX II, ¶ 5; Taylor Decl. 9–10; PTO ¶¶ 65–66.

do so.[46] Taylor explained that he expected that the Vessel would flush its lines and cargo tanks and that this would dislodge any contaminant on board the Vessel.[47] While the Vessel did not flush its tanks and lines,[48] a communication between the DFSC and the MSC indicates that the government believed that the Vessel had done so.[49]

On October 6, the Vessel returned to the KNPC terminal to attempt a second loading. Later that day, Phillip T. John, the SGS Kuwait independent cargo inspector for the second loading, and Sluder witnessed KNPC laboratory tests of fuel samples drawn from the shore pipeline designated to load the Vessel. Although the fuel in the line tested on-spec, it was flushed for reasons not relevant here.[50] Samples taken after the flushing also tested on-spec.[51]

The second loading attempt began the next day, October 7, using two chicksans, nos. 3 and 4.[52] Approximately ten minutes into the loading, Sluder and John drew samples from the base of each.[53] While the fuel from chicksan no. 4 appeared fine (water-white, clear and bright), that from chicksan no. 3 had a clear yellow hue,[54] although it tested on-spec. Sluder never-

theless ordered that chicksan no. 3 be closed down as an extra precaution.[55] Loading continued until the fuel in cargo tank 6C reached a level of one meter whereupon samples were taken and tested.[56] The analysis revealed that the fuel in tank 6C was off-spec by a significant amount.[57] John then drew a sample from the chicksan manifold—a location between the chicksan and the ship—the analysis of which indicated that it was on-spec.[58]

*Termination of the Contract*

After being told of the first foot sample results, Dwight Duncan, the DFSC Quality Assurance Specialist, and William Connolly, the MSC Tanker Project Officer, determined that no more cargo would be loaded onto the Vessel.[59] In response, the Vessel's master filed a note of protest, citing reasons other than Vessel contamination for the failed tests, and asserted that all delays and consequent losses would be for the defendant's or terminal's account.[60]

Seeking to terminate the Contract, Taylor first proposed a bilateral cancellation. On October 8, he proposed that Torm pay the costs of the degraded fuel and for the time and expense of the Vessel at the load port. If, however, Torm could show that

46. Sluder Dep. 160–164; PX 214.

47. Taylor Decl. 7–9; DX V; PX 214. Dwight Duncan of the DFSC testified also that he believed a flushing would suffice. Duncan Decl. 4–5.

48. PTO ¶ 35.

49. PX 218 (Oct. 4, 1996 electronic mail message from Dwight Duncan to Jeff Connolly of the MSC).

50. Sluder Decl. 15; PTO ¶ 16.

51. Sluder Decl. 15.

52. PTO ¶ 18. The chicksan is a moveable loading arm connecting the shore pipeline to the Vessel manifold. Sluder Decl. 9.

53. Sluder Decl. 15. Fuel through chicksan 4 continued loading for a total of 35 minutes.

54. *Id.* at 15–16.

55. PTO ¶ 36.

56. Sluder Decl. 16.

57. PTO ¶ 36. The analysis revealed that the particulate count was at 5.42 mg/L with a filtration time of 30 minutes. *Id.* Because of questions regarding the purity of the fuel flowing from one of the two chicksans (chicksan no. 3), Sluder and Brown tested samples obtained from it. Sluder Decl. 16. The results indicated the fuel in chicksan no. 3 was on-spec, with a particulate count of 0.56 mg/L and a filtration time of 8.5 minutes. *Id.*

58. John Dep. 47–49; DX HH. The test results indicated a particulate count of 0.33 mg/L and a filtration time of 8.0 minutes. DX HH.

59. PTO ¶ 19; Connolly Decl. 7; Duncan Decl. 5.

60. DX KK.

the Vessel was not the cause of the contamination, it would have the right to claim for repayment of the damages.[61] He gave Torm until mid-afternoon that same day to respond. When he did not receive a response from Torm, however, Taylor decided to terminate the contract on the ground that Torm had not performed within the time specified in the Contract.[62] Later in the afternoon of October 8, Taylor advised Torm that the MSC intended to terminate the Contract for default, asked Torm to show cause why such action should not be taken,[63] and gave Torm twenty-four hours in which to respond.[64] After granting Torm two extensions, and hearing nothing upon the expiration of the second, Taylor terminated the Contract.[65] Torm sold the second load of fuel on behalf of the United States for a loss of $81,308. 19.[66]

*Condition of the Cargo at Loading and the Source of Contamination*

The parties devoted much effort to establishing the condition of the Cargo at the time of loading and the source of the contamination. The government contends that the fuel was on-spec when delivered and therefore was contaminated on the Vessel. Torm claims that the Cargo was not on-spec to begin with and that the Vessel had nothing to do with its contamination. This debate centers, in the main, on two bodies of evidence. The first focuses on the testing of the "retain samples"—samples of fuel that were collected throughout the loading of cargo and stored for later use,[67] particularly for testing if there were a subsequent dispute as to the quality of the Cargo.[68] The second involves the Vessel's inert gas generator (the "IGG"), a piece of equipment which generated inert gas pumped into the Vessel's cargo tanks immediately prior to the loading of this and other explosive cargoes.

*Retain Samples*

Throughout the loading attempts, SGS Kuwait drew the retain samples at various points of the loading procedure—the terminal pipeline, chicksan manifold, Vessel manifold and Vessel cargo tanks.[69] The samples were stored in an unrefrigerated SGS Kuwait underground facility.

In July 1997, nine months after the aborted loading, the retain samples were released to the local agent for the Vessel's Protection and Indemnity Club for testing, the purpose of which was to determine whether the Cargo was on-spec prior to its loading, as indicated by the KNPC tests performed at the time of loading.[70] In September 1997, the samples were shipped to M–Scan, an independent laboratory in the United Kingdom, where they were catalogued,[71] and then transported to Inspectorate, another independent U.K. laboratory, for testing (the "Inspectorate Analysis"). Although not a party (by choice) to the Inspectorate Analysis, the United States sent a representative to observe.[72]

The testing was conducted on September 18 and 19 by Michael Battie[73] on samples selected by Charles Durbridge, plaintiff's expert, and Thomas Miller, representing either Torm or NOL.[74] The test

---

61. Taylor Decl. 13.

62. *Id.* at 14.

63. PTO ¶ 54; DX MM.

64. PTO ¶ 54; DX MM.

65. PTO ¶¶ 55–56, 61; DX NN, QQ, SS.

66. PTO ¶¶ 67, 68.

67. Sluder Decl. 17.

68. Brown Dep. 122.

69. DX XXX.

70. PTO ¶ 52.

71. PX 129–132.

72. Battie Dep. 106–07; PX 103 at 1, 104 at 4.

73. Battie Dep. 22–23.

74. *Id.* at 17–20; Durbridge Dep. 32.

results of the shore pipeline retain samples demonstrated the following: [75]

| | PARTICULATE MATTER | FILTRATION TIME |
|---|---|---|
| Test No. 1 | 2.7 mg/liter | 11 minutes |
| Test No. 2 | 1.4 mg/liter | 11 minutes |

Thus, these tests superficially suggest that the Cargo was off-spec prior to loading.

The government argues that the retain samples were not a reliable indicator of the condition of the fuel at the time of loading. It claims that (1) the retain samples deteriorated due to their age and exposure to the high ambient temperatures of Kuwait; (2) the samples used in the first test were stored in containers which had epoxy linings known to flake; and (3) the samples used in the second test were unrepresentative of the fuel actually loaded onto the Vessel. There is substantial evidence to support the government's contentions.

To begin with, defendant's expert stated that oxidation would result in the formation over time of insoluble gums, which would increase the likelihood that the samples would show high particulate matter and long filtration times irrespective of the condition of the fuel when the samples were drawn. [76] In addition, the retain samples used in the first test were stored in epoxy-lined containers of a type that are believed to result in contamination of their contents due to the flaking of the coating on the threads of their caps. [77] While the retain samples subjected to the second test were not stored in such containers, the results from that sample are independently suspect because the sample was a composite of four separate samples drawn at

two different times, [78] one of which followed the flushing of the lines. Hence, it is entirely possible that the difficulties with test no. 2 were attributable to contamination in the on-shore pipeline at the time of the drawing of the first two samples that had been eliminated by the time the second pair of samples was drawn. [79]

Torm, to be sure, quarrels with the government's attempts to explain away the disparity between the contemporaneous tests, which showed that the Cargo was on-spec when it entered the Vessel, and the much later analyses of the retain samples, which suggested otherwise. It notes, among other things, that the precise nature of the particulate matter detected in the retain samples was not determined, [80] which makes it impossible to know whether the particulates consisted of epoxy flakes or insoluble gums, as the government suggests, and that the presence of an antioxidant in this fuel made the formation of insoluble oxidation products unlikely. In the last analysis, however, the Court is more persuaded by the contemporaneous results and finds that the fuel was on-spec when it arrived on the Vessel and that it was contaminated there. The age of the retain samples, the conditions under and the containers in which they were stored, and the mixing of the individual samples, the aggregation of which was analyzed in test no. 2, renders the analyses of the retain samples sufficiently questionable to convince the Court that they will not bear the weight that Torm would place upon them.

75. PX 104. Test No. 1 was of a sample taken from the shore line prior to the first loading attempt. Test No. 2 was a composite of four samples taken from the shore line prior to the second loading attempt. *Id.* Filtration times are rounded to the nearest whole minute.

76. Mackin Decl. 3.

77. *Id.* at 4; *see also* PX 185, 186.

78. PX 104.

79. Two of the samples were drawn on October 6 at 2015 hours and the others at 0100 hours on October 7. PX 104. The line from

which the samples were drawn was flushed and repacked with fuel between 2115 hours on October 6 and 0145 hours on October 7. PTO ¶ 16; DX CC, HH, II; John Dep. 28–29, 33, 103; Sluder Decl. 15. The second attempt to load cargo did not occur until 0245 hours. Hence, the second half of the retain sample used for Test No. 2 might have been entirely clean, but the entire combined sample contaminated by particulates from the first half.

80. Battie Dep. 75.

*The Inert Gas Generator*

The government contends that a likely source of the contamination was a defective IGG aboard the Vessel. Plaintiff responds that the Vessel and its IGG were inspected and maintained regularly.[81] That, the government rejoins, was the problem—the IGG was maintained *too* regularly for it to have been working properly.

After considering the testimony of Tan Yew Kwang, a technical superintendent of NOL and the technical representative of the Vessel in 1996,[82] and the Vessel's work book indicating maintenance performed on the IGG by the crew,[83] there is little doubt that the IGG was problematic. The device comprised several components, including the deck seal, the scrubber tower, the spray nozzle, the demister pads, the burner and the combustion chamber.[84] As with any piece of sophisticated machinery, these components required regular maintenance, and both the manufacturer and NOL had recommended maintenance schedules.[85] According to Kwang, had the IGG aboard the Vessel been functioning properly, maintenance would not have been required more frequently than recommended.[86] In the months preceding the events at issue, however, the IGG aboard the Vessel underwent extensive maintenance—far beyond that recommended by either the manufacturer or NOL.

The scrubber and its demister pad, regularly scheduled for cleaning every six months,[87] were cleaned in March and May 1996.[88] The scrubber was cleaned again later in May, though with a more powerful chemical wash. It was washed once again in June.[89]

The IGG's burner appears to have been in a frequent state of disrepair. Its recommended regular maintenance included removal from the combustion chamber and cleaning of the nozzle.[90] If the nozzle was found to be working improperly, it would be replaced, although it would be replaced also if the burner were overhauled.[91] Regular maintenance of the burner was to occur every three to six months.[92] From the beginning of 1996 to the first attempted loading of Cargo to the Vessel, however, the burner was cleaned or replaced in January, March, twice in May, June, July, August and September 1996.[93]

---

81. *See* PX 83–96, 98–101; Kwang Dep. 16–30; 162–63.

82. Kwang Dep. 3–4.

83. DX WWWW.

84. The burner produces the inert gas. The combustion chamber houses the burner and contains the combustible product used to produce the inert gas. The scrubber tower washes down the inert gas, ridding it of sulphur dioxide and other contaminants. The spray nozzle directs water coolant onto the scrubber tower, cooling down the inert gas. The deck seal prevents the back flow of the inert gas produced from going back into the engine room. The demister pads are located on both the scrubber tower and the deck seal and filter out water and carbon from the inert gas. Kwang Dep. 34–38, 57–59.

85. DX VVVV, FFFF. The following are, in pertinent part, the recommended schedules:

| | Manufacturer | NOL |
|---|---|---|
| Scrubber Tower: | 6 mos. | 6 mos. |
| Burner Unit: | 6 mos. | 3 mos. |
| Deck Seal: | 12 mos. | 6 mos. |
| Combustion Chamber: | 6 mos. | 12 mos. |

86. Kwang Dep. 60–67, 128–29, 136.

87. DX VVVV, FFFF; Kwang Dep. 60–61, 128.

88. Kwang Dep. 131; DX WWWW.

89. Kwang Dep. 135; DX WWWW. Kwang acknowledged that it was possible that the more powerful chemical wash was used to remove soot. Kwang Dep. 135.

90. Kwang Dep. 63.

91. *Id.* at 63–64.

92. The manufacturer's recommended maintenance period was six months, while NOL's was three. DX VVVV, FFFF.

93. DX WWWW. In August 1996, the burner unit was "decarbonized." *Id.* Kwang testified that this was equivalent to an overhaul. Kwang Dep. 142.

Finally, although scheduled for inspection every six to twelve months, the combustion chamber was checked every other month from January through May and then every month thereafter through August, and most likely again in mid-September.[94] During each inspection, other than the one in May, the unit was cleaned.[95] Kwang explained the frequency of the inspections, testifying that he instructed the Vessel to inspect the combustion chamber before and after each operation of the IGG as "an additional precaution . . . to prevent any soot from carrying over." [96]

Kwang testified that the production of soot is a common problem with IGG's.[97] An improperly functioning burner or burner nozzle, Kwang acknowledged, could result in poor combustion and poor quality inert gas,[98] which means the introduction of carbon or soot into the gas.[99] His testimony suggests also that the Vessel's frequent cleaning of the unit was to remove soot from the combustion chamber. The extensive servicing of the various components is strong evidence of a troubled IGG, and the cause of the concomitant cleaning of the combustion chamber and scrubber tower. In fact, during service work on the IGG in

April 1997, technicians found poor combustion and the carrying over of soot.[100]

A malfunctioning IGG, introducing soot into the cargo tanks during the inerting process, fits well with the other facts of this case. First, it is compatible with the testimony that the Vessel's crew adequately cleaned the cargo tanks while proceeding toward Kuwait. The IGG must be operated immediately before the loading of fuel—that is, inerting occurs *after* the tank cleaning. So no matter how well the tanks were cleaned, they may have been unfit for cargo if the IGG was emitting contaminants. Second, there was a thin layer of carbon soot on the tanks' surfaces.[101] Third, in a memorandum describing the Vessel's tank cleaning sent to NOL, the Vessel's master made reference to scrubbing and sweeping carbon soot. He noted too that "for this one reason (carbon) I had also expressed my no guarantee of passing" the tank inspection.[102] Captain Kooi attributed the presence of the carbon to the IGG system.[103]

Torm, for its part, points to evidence militating against a finding that soot from the IGG caused the Cargo on board the Vessel to go off-spec. First, during the Inspectorate Analysis, Durbridge failed to

**94.** On September 13, a crack in the combustion chamber was repaired. According to Kwang, the crew might have checked the unit at that time. Kwang Dep. 168. The Court finds it highly probable that such would have occurred.

There appears to have been some confusion during Kwang's deposition about the date of the combustion chamber crack. In consequence, the parties referred to the date as September 3, not the correct date of September 13. *See* Testimony of the United States, Kwang Dep. Summary 8 n. 1.

**95.** DX WWWW. Kwang testified that where the maintenance log said "cleaned," it may have meant "clean," suggesting that the unit was not cleaned every time it was inspected, but rather was found to be clean. Kwang Dep. 138–139. The Court does not credit this explanation. First, the author of the log appears to have had an adequate command of the English language to discern between adjectives and verbs. Second, the Court notes that the word "clean," in fact, appears at

least twice—in an entry on May 11 and again on May 13. Finally, the author knew how to convey that the unit was inspected but not cleaned, as evidenced on May 21 when he wrote "IGG demister & scrubber chamber opened up for inspection," rather than "inspected and cleaned" as he wrote elsewhere. DX WWWW.

**96.** Kwang Dep. 129–130, 137, 165.

**97.** *Id.* at 108.

**98.** *Id.* at 65, 109.

**99.** *Id.* at 109, 129.

**100.** *Id.* at 115–116.

**101.** PTO ¶¶ 32, 44, 45.

**102.** DX FF (Oct. 10, 1996 telex).

**103.** Kooi Dep. 188.

observe any carbon particles in the retain samples drawn from the Vessel's tanks.[104] Similarly, John testified that (1) he did not observe any black particles in the samples he drew during the second loading attempt, (2) he would have made note of them if he had,[105] and (3) soot particles would have been visible in the samples had they been introduced by the IGG.[106] Next, Miranda testified that the crew, recognizing that carbon soot from the IGG could contaminate the cargo, checked the quality of the IGG gas and it tested clean.[107] This is supported by communications at the time between the Vessel and NOL.[108] Finally, according to Miranda, two things were done after the second loading attempt failed. The crew opened up the filters on the deck seal and scrubber units, which allegedly did not reveal carbon soot in excess of "normal operating parameters," [109] and Mr. Kalam of Burislee mixed a sample of pure jet fuel with some IGG carbon soot. Miranda testified that the mixture appeared different than the sample drawn from the Vessel's cargo tanks.[110]

As will appear below, the question whether the IGG was the source of the contamination ultimately is an issue on which Torm bears the burden of proof, as it goes to whether Torm has rebutted the inference that arises from plaintiff's proof of a *prima facie* case, viz. that the fuel was delivered to the Vessel in an uncontaminated condition. There is little doubt that the IGG was not functioning properly prior to the events at issue here and that at least one of the problems was its generation of soot. Torm was well aware of this, as evidenced by (1) the master's October 8

telex to NOL expressing his concerns with the previous ship cleaning, (2) the telexes from the Vessel assuring NOL that the inert gas "quality is perfect" and that it was following the instructions of NOL's Tanker Technical Department regarding the oxygen content to be maintained,[111] and (3) Kwang's instruction to the Vessel to inspect the combustion chamber before and after each use to prevent the carrying over of soot with the inert gas. Nevertheless, plaintiff did not alert MSC to the potential problem and did not carry out Kwang's instruction to clean the combustion chamber prior to the first attempted loading on October 2.[112]

Torm's evidence is not wholly lacking in force. Nevertheless, bearing in mind such factors as Durbridge's overall lack of credibility, Miranda's clear interest, the possibility of error by John, and the logic and plausibility of the government's evidence, the Court finds that Torm has failed to establish either that the IGG was not the source of the contamination or, if it was, that it contaminated the Cargo through no fault of Torm.

## Discussion

Torm claims that the MSC wrongfully terminated the Contract and seeks a determination to that effect, as well as damages, demurrage, lost profits and out-of-pocket expenses resulting from that termination in the amount of $364,886.07. Torm seeks also demurrage arising from the MSC's charter of plaintiff's vessel, the TORM LILLY, in the amount of $66,251.73, which has been withheld as an offset by the government. The government con-

104. PX 183, at 21.

105. John Dep. 95–97, 114.

106. *Id.* at 115.

107. Miranda Dep. 50–54, 62–63;

108. PX 13 (Oct. 2 telex from Vessel to NOL), 14 (Oct. 4 telex from Vessel to NOL), 287 (Oct. 4 telex from Vessel to NOL).

109. Miranda Dep. 80–81; *see also* PX 288 (Oct. 8 telex from Vessel to NOL).

110. Miranda Dep. 79.

111. PX 13, 14.

112. *See* DX WWWW. There is no record in the log book of any inspection after the crew discharged a load of fuel on September 15, 1996, *id.*, an activity for which the IGG had been operated. Miranda Dep. 62.

tends that its termination was justified and that it owes Torm nothing. It asserts that the Vessel contaminated approximately 30,000 barrels of its Cargo and counterclaims for damages in the amount of $83,937.99, less the $66,251.73 it admittedly owes Torm for demurrage in respect of the TORM LILLY.

*Termination*

Section 249–8(a)(1) of the Federal Acquisition Regulations ("FAR"), which were incorporated into the Contract, permitted the government to terminate a charter party such as this if the carrier failed to:

> "(i) Pick up the commodities or perform the services, including delivery services, within the time specified in this contract or any extension;
>
> "(ii) Make progress so as to endanger performance of this contract; or
>
> "(iii) Perform any of the other provisions of this contract...." [113]

It was free to terminate under clause (i), without notice or opportunity to cure. In order to terminate under either clause (ii) or (iii), however, the government was obliged to provide the contractor with notice of the specific deficiency and ten days in which to cure it.[114] A procedurally defective termination under clause (i), moreover, would be treated as a termination for convenience,[115] in which event the government would be liable for certain statutory payments, including the contract price for completed services accepted by the government, the costs incurred on work already performed and reasonable profits.[116] Inasmuch as the government did not give Torm notice of the specific deficiency or allow Torm ten days in which to cure it, this termination was impermissible under Section 249–8(a)(1) unless justified under clause (i).

The government contends that its termination was justified because Torm failed, in the time specified by the Contract, to present a valid NOR and load the Cargo. In the alternative, the government claims that the Vessel was not suitable for the required service and that the MSC therefore was entitled to cancel under the Inspection Clause.

*Invalid Notice of Readiness*

■ The government argues that it properly terminated the Contract under Section 249–8(a)(1)(i) because (a) the Contract required the Vessel to tender an NOR by September 30, 1996, the cancellation date, (b) although an NOR was tendered, it was inaccurate because the tanks were not clean and ready for loading, and (c) an inaccurate notice is no notice at all. This argument fails because clause (i) did not require the tender of an NOR within the period relied upon. That is, clause (i) addressed only the time specified in the Contract to "pick up the commodities or perform the services." The time specified in the Contract for tender of the NOR did not fall into either of these categories.[117] Hence, this termination was not justified under clause (i) even if the NOR was inaccurate.

*Failure to Complete in a Timely Manner*

The government argues next that Torm failed to load the Cargo within the requisite time which, it contends, was (a) the period allowed for laytime, or (b) a reasonable time.[118]

---

**113.** 48 C.F.R. § 52.249–8(a)(1).

**114.** *Id.* § 52.249–8(a)(2).

**115.** *Id.* § 52.249–8(g).

**116.** *Id.* § 52.249–2(g).

**117.** The Court notes that the government was not without a remedy if the Vessel failed to tender a valid NOR. The failure of the Vessel to tender a valid NOR by the cancellation date entitled the MSC to cancel the Contract, as distinguished from terminating it under Section 249–8(a)(1)(i). DX A § g, at 12.

**118.** *See* Def. Trial Mem. 33.

■ Laytime, or laydays, is "[t]he period of time *allowed to the charterer* under the charter party for loading and unloading."[119] The allowance of laydays protects the shipowner from its vessel lying dormant, waiting for cargo to be loaded or unloaded.[120] Accordingly, "[a]fter the agreed laydays have expired, the charterer is liable for delay according to an agreed daily or hourly rate of liquidated damages known as 'demurrage,'"[121] provided that the ship owner is not at fault for the delay.[122] The consequence of delay due to the fault of the vessel is not breach of the charter party. Rather, it is simply that the laytime is extended, i.e., the shipowner loses its entitlement to demurrage, which protects the charterer's interest in speedy loading and unloading.[123] That is not to say that a shipowner never will be required to load or unload a cargo by a particular date. "If a vessel, having agreed to load or discharge a cargo on a day certain, fails to do so, the usual remedies for a breach of contract may be recovered."[124] Here, however, the Contract made no reference to a date certain by which the loading or discharge of the cargo was to commence or conclude.[125] Thus, the failure of the Vessel to load the Cargo within the 72 hours of allotted laytime, whatever other effect it may have had, did not justify termination under Section 249–8(a)(1)(i).

The government's alternative argument, notwithstanding its superficial appeal, also is without merit. Section 249–8(a)(1)(i) of the FAR permits termination for failure to "[p]ick up the commodities or perform the services ... within the time specified .." But the contract contained no date certain by which the loading or discharge of the Cargo was to commence or conclude. Moreover, it is difficult to read Section 249–8(a)(1)(i) as permitting termination for failure to load within a reasonable time in light of Section 249–8(a)(1)(ii), which permitted termination following notice and an opportunity to cure where the contracting party failed to make progress in a manner endangering performance. There simply would be little sense to construing Section 249–8(a)(1)(i) as allowing termination without notice in such a circumstance, a failure often remedied where notice and an opportunity to cure is given, when the contract so readily permits termination after such notice and opportunity for failure to make appropriate progress.

In consequence, the Court finds that the MSC was not justified in terminating the Contract on the basis of 48 C.F.R. § 52.249–8(a)(1)(i). Since any other termination for default required defendant to provide Torm with ten days notice and opportunity to cure prior to terminating the Contract, and defendant failed to provide such notice and opportunity, its termi-

**119.** 2A Steven F. Friedell, Benedict on Admiralty § 201, at 18–1 (7th ed. (rev.) 1999) (hereinafter Benedict on Admiralty) (emphasis added); *accord* 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 11–15, at 201 (2d ed.1994) (hereinafter Schoenbaum); *In re M/V Nicole Trahan*, 10 F.3d 1190, 1192 (5th Cir. 1994); *Trans–Asiatic Oil Ltd., S.A. v. Apex Oil Co.*, 804 F.2d 773, 775 n. 1 (1st Cir.1986); *Larsen v. A.C. Carpenter, Inc.*, 620 F.Supp. 1084, 1119 (E.D.N.Y.1985) (quoting 2B Benedict on Admiralty § 31, at 2–1 (M. Cohen 7th ed.1985)).

**120.** 2 Schoenbaum § 11–15, at 201.

**121.** *Id.*

**122.** 2A Benedict on Admiralty § 207, at 18–23; *see also Pennsylvania R.R. Co. v. Moore-*

*McCormack Lines,* 370 F.2d 430, 432 (2d Cir. 1966).

**123.** *Milburn v. Federal Sugar Refining Co.,* 161 F. 717, 717–719 (2d Cir.1908).

**124.** *Id.* at 719 (citing *Petrie v. Heller*, 35 F. 310 (S.D.N.Y.1888)).

**125.** The only dates certain were the commencement and cancellation dates, September 27th and 30th. That is, absent agreement to the contrary, the Vessel could not have been loaded prior to the 27th, *see* 2A Benedict on Admiralty § 204, at 18–15, and risked cancellation of the contract if it arrived after the 30th.

nation was not consistent with Section 249–8(a)(1).

## Cancellation

### Reliance on the Inspection Clause

The government argues that it did not breach the Contract even if its termination under Section 249–8(a)(1) was unjustified on the theory that it was entitled to cancel anyway under the Inspection Clause,[126] which allowed the government unilaterally to cancel the Contract "[i]f in the opinion of the Charterer's inspector any deficiency or condition exist[ed] which render[ed] the Vessel inadequate for the required service."[127] The government's position is that the KNPC test results demonstrated the Vessel's unsuitability and that it cannot be liable for wrongful termination because it had a valid basis on which to cancel the Contract.

Torm argues that the government is now precluded from asserting an alternative basis for ending the Contract under the Inspection Clause in light of its prior election to terminate for default.[128] It contends that the government has waived, or is estopped to rely on, any right to cancel.

Torm's argument implicates a long established doctrine of government contracts law which originated with *College Point Boat Corp. v. United States*.[129] The case arose out of a World War I Navy contract for the manufacture of collision mats. Shortly after the armistice, the Navy decided that it no longer needed the goods, suggested that the manufacturer cease production and—being ignorant of a newly

enacted statute which gave the Navy an unconditional right to cancel the contract—invited a proposal for termination of the contract. The negotiations were fruitless, and the contractor sued on the contract.

In due course, the government sought to assert its statutory right of cancellation and was met with very much the same argument Torm makes here. Contending that the government never canceled under the statute, the contractor argued that the government was bound by its pre-suit election to treat the contract as being in force and should not have been heard to rely on the statute. The Supreme Court, however, rejected the argument. Although it recognized that the government never canceled under the statute, it ruled that the right of cancellation "limited the value of the plaintiff's right to require performance" and precluded any recovery of prospective profits.[130]

*College Point Boat* gave rise to the so-called constructive termination for convenience doctrine, which "allows an actual breach by the government to be retroactively justified."[131] In *John Reiner & Co. v. United States*,[132] one of the leading cases, the Court of Claims held that an unjustified termination by the government for default will be treated as a termination for convenience—that is, that a baseless termination for default is a constructive termination for convenience—where the contract permits such terminations not-

---

126. *See* PTO § IV ("Parties Contentions"), at 19; DX A, § g at 8.

127. DX A, § g, at 8.

128. *Cecile Industries, Inc.*, 81–1 B.C.A. (CCH) ¶ 15,222, at 74, 814 (A.S.B.C.A.1981), *later proceeding*, 83–2 B.C.A. (CCH) ¶ 16,842 (A.S.B.C.A.1983); *Roged Inc.*, 76–2 B.C.A. (CCH) ¶ 12,018 (A.S.B.C.A.1976).

The facts of *Cecile* differ from those at bar. The government there sought to change its termination for convenience to one for default. Here, defendant is seeking to change

its basis of termination from default to the Inspection Clause. The consequences of the two are different.

129. 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925).

130. *Id.* at 16, 45 S.Ct. 199.

131. *Linan–Faye Constr. Co. v. Housing Auth. of the City of Camden*, 49 F.3d 915, 923 (3d Cir.1995).

132. 163 Ct.Cl. 381, 325 F.2d 438 (1963).

withstanding the failure of the government contract officer to rely on that clause.[133]

■] The circumstances of this case differ modestly from those of *College Point Boat* and its progeny. In those cases, the government either assumed that it had no right to terminate or purported to terminate on an unjustified basis, each in a context in which it had but failed to rely upon a basis for halting performance that would have prevented the recovery of prospective profits. Here, the government purported to terminate on a basis which the Court has found unjustified, but failed to rely on the Inspection Clause which, if the government's allegations are meritorious, gave it an unqualified right to cancel without any liability at all. But the difference is not material. The fundamental proposition established in *College Point Boat* is that one whose government contract is terminated may not recover more than would have been available if the government exercised all of the rights available to it, irrespective of any errors or omissions by the government contracting officer.[134] And this principle makes considerable good sense. There is little reason, after all, why the taxpayers should bear additional economic burdens because a government contract officer misapprehended the legal rights available to the government.

■ Accordingly, this Court holds that the government is entitled to rely on the Inspection Clause in its effort to defeat Torm's claim on the Contract notwith-standing its failure to rely upon it at the time.

### The Standard for Cancellation

Having determined that the government may rely on the Inspection Clause in an effort to justify its cancellation of the Contract, the question becomes whether the facts support its position.

The Contract provided that the Vessel was "subject to [the MSC's] inspection as to suitability for the required service prior to acceptance of the Vessel" and that "[i]f in the opinion of the [MSC's] inspector any deficiency or condition exists which renders the Vessel inadequate for the required service, the ·[MSC] shall have the option to cancel this Charter Party at no cost to the Government." [135]

In *Misano di Navigazione v. United States*, [136] the Second Circuit addressed the appropriate standard for satisfaction of a substantially similar provision in a charter party between the MSC and a vessel owner for the carriage of military fuel oil. Noting, *inter alia*, "[t]he frequency with which the Charter states that the final decision remains with the Inspector, [and] the clause alleviating the Government of liability upon cancellation," the court held that "the parties intended to impose upon the Inspector's decision only a good faith standard of satisfaction." [137] It found "most convincing ... the language affording the Government the option to cancel the Charter 'without any liability whatsoever' upon the Inspector's rejection of the tanks." [138]

---

**133.** *Id.* at 442–43. *Accord, Linan–Faye Constr. Co.,* 49 F.3d at 924.

**134.** This proposition is not utterly boundless. The constructive termination for convenience doctrine, for example, does not permit the contract to be treated in such a way as to give the government "a route of complete escape ... that vitiates any other consideration furnished and [that would be] ... incompatible with the existence of a contract." *Linan–Faye Constr. Co.,* 49 F.3d at 924 (quoting *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 769 (1982) (internal quotation

marks omitted)). But these considerations are not implicated here because the Inspection Clause permitted cancellation only in narrow circumstances indicative of breach by Torm.

**135.** DXA § g, at 8.

**136.** 968 F.2d 273 (2d Cir.1992).

**137.** *Id.* at 275.

**138.** *Id.* at 276.

■ Here, too, the Contract gave the final decision to the MSC's inspector. And while it did not use the exact language at issue in *Misano,* the Contract employed substantially similar language, providing that the MSC could cancel the contract *"at no cost* to the Government" for "any deficiency or condition" rendering the Vessel inadequate.[139] Following the reasoning of *Misano,* a good faith standard of satisfaction is all that is required here.

Defendant's actions easily met this standard. On the night prior to the first attempted loading, Sluder and Brown carried out a visual inspection of the Vessel and accepted it subject to an analysis of the first foot samples. The Vessel failed to pass that analysis on October 1 and again on October 7. Meanwhile, the fuel samples obtained from the shore pipelines, chicksans and tank no. 533 all tested on-spec.[140] The only evidence suggesting otherwise was the yellow color of the fuel coming from chicksan no. 3 during the October 7 loading,[141] but that fuel sample tested on-spec.[142]

■ Taylor thus knew that (1) the shore tank fuel samples, the samples taken from the shore lines and chicksans supplying the fuel to the Vessel, and the fuel coming from chicksan no. 3 during the October 7 loading attempt all tested on-spec, but (2) the first-foot cargo tank samples from both the October 1 and 7 loading attempts tested off-spec. This clearly suggested that the tanks were not clean. Hence, the

Court finds that Taylor justifiably and in good faith concluded that the Vessel was not suitable for the carriage of the Cargo. Although he did not purport to act under the Inspection Clause, he would have been justified in doing so. Moreover, the action he did take shows that he terminated on the basis permitted under this Clause, although he did not utter precisely the right form of words. The government therefore is not liable.[143]

*The Government's Counterclaim*

The government claims that Torm failed to exercise due diligence in furnishing a seaworthy Vessel, resulting in damages of $83,937.99 to the government-owned fuel that the Vessel allegedly contaminated attempting to load the Cargo.

As a threshold matter, the parties agree that the Carriage of Goods by Sea Act ("COGSA")[144] applies to the government's claim for damages. COGSA imposes on ocean carriers the duties (1) to exercise due diligence to make the ship seaworthy, which includes making "the holds ... and all other parts of the ship in which goods are carried, fit and safe for their reception. carriage, and preservation,"[145] and (2) to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."[146]

■ To recover for breach of these duties, the shipper has the burden of proving that the goods were damaged while in the vessel's custody.[147] The shipper makes

---

**139.** DX A § g, at 8 (emphasis supplied).

**140.** Torm argues that the shore tank analysis occurred too early, contrary to industry practice. *See* Pl. Trial Mem. 34–35. Irrespective of whether Torm is correct, the issue is Taylor's subjective belief. There is no indication that the date of the analysis made Taylor question his decision.

**141.** Chicksan no. 3 was used for about 10–13 minutes of the 35 minute loading time. It was discontinued when the fuel color became known. John Dep. 35–38.

**142.** PTO ¶ 36.

**143.** The government argues also that Torm breached its warranty to supply a Vessel with cargo tanks acceptable to receive the cargo. In light of this Court's decision above, it is not necessary to decide that question.

**144.** 46 U.S.C.App. § 1300 *et seq.* The parties do not dispute that COGSA applies to the government's claim for damages.

**145.** *Id.* § 1303(1).

**146.** *Id.* § 1303(2).

**147.** *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347 (2d Cir.1981).

out a *prima facie* case by demonstrating that it loaded the goods to the carrier in good condition and that they were unloaded in damaged condition.[148] The burden of persuasion, however, remains with the shipper throughout the case.[149] That is, "if the [carrier] does go forward with evidence enough to raise doubts as to the validity of the inference, which the trier of fact is unable to resolve, the [shipper] does not sustain the burden of persuasion."[150] As long as the shipper carries its burden, however, it is entitled to damages unless the carrier demonstrates that the damage was not caused by breach of the shipowner's duty to provide a seaworthy vessel or that the damage falls within one of the COGSA exceptions set forth in 46 U.S.C.App. § 1304(2).[151] If, as here, the carrier relies on 46 U.S.C.App. § 1304(2)(q), the so-called "q clause," to exonerate itself from liability, it bears the burden of proof.[152]

### The Government's Prima Facie Case

It is undisputed that the Cargo was contaminated once it was aboard the Vessel. The parties dispute whether a *prima facie* case has been made because they disagree whether the fuel was loaded in good order.

The evidence strongly supports the government's view. It has demonstrated that fuel samples drawn immediately prior to each loading and from points all along the pipe line route up to the point of custody transfer tested on-spec. Those drawn from the Vessel's cargo tanks immediately after each loading tested off-spec. Nothing happened in the interim.

Torm responds with a series of arguments and theories intended to demonstrate that the Cargo was off-spec prior to loading. It points first to the evidence that the KNPC laboratory filtration pads used in the testing of the shore line samples from the first loading attempt acquired a "brown/rust" color and that the fuel from chicksan no. 3 during the second loading attempt was yellow. Those samples, however, passed the filtration time and particulate matter tests that determined whether the fuel was on- or off-spec.

Recognizing that these apparent defects are meaningless in light of the test results. Torm suggests that the tests were biased. It points out that all of the testing was performed by KNPC rather than by "one of the well known industry recognized independent laboratories"[153] and intimates that, as between itself (as seller) and the Vessel, KNPC personnel would blame the Vessel for the off-spec cargo.[154] But Torm fails to offer a shred of evidence supporting its insinuation of bias. Moreover, this argument appears to be a red herring in light of Brown's testimony that there are no independent laboratories in Kuwait and that all independent surveyors rely on the results of the KNPC laboratory.[155]

Torm next argues that whatever particulate matter may have existed in the fuel drifted to the bottom of the tank during

**148.** *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 104 (2d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *see also GTS Industries S.A. v. S/S Havtjeld*, 68 F.3d 1531, 1537 (2d Cir.1995); *Bally, Inc. v. M.V. Zim America*, 22 F.3d 65, 69–70 (2d Cir.1994).

**149.** *GTS Industries, 68 F.3d at 1537; accord SNC S.L.B. v. M/V Newark Bay*, 111 F.3d 243, 246 (2d Cir.1997).

**150.** *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 812 (2d Cir.1971).

**151.** *GTS Industries, 68 F.3d at 1535–37; see also Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 32 (2d Cir.1982); *accord M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103 (2d Cir.1985); 2 SCHOENBAUM § 10–24, at 105–112.

**152.** 46 U.S.C.App. § 1304(2)(q).

**153.** Pl. Trial Mem. 8.

**154.** *Id.* at 34–35.

**155.** Brown Dep. 17, 19; *see also* Mackin Decl. 1.

the nineteen days between the testing of tank no. 533 and the first loading. Since the fuel was loaded from the bottom of the tank, the argument goes, an unrepresentative sample of contaminated fuel was loaded on board the Vessel.[156] But the argument is without merit.

To begin with, there is no evidence that there were any particulates to begin with. Even if there were, the only testimony supporting Torm's theory is that of its expert, Charles Durbridge. But the Court does not credit his testimony.[157] In any case, the samples taken from the shore line after loading began tested on-spec, and there is no evidence that the sampling or testing was faulty.[158]

Torm contests also the KNPC laboratory results of the tests performed on the samples drawn from the Vessel cargo tanks on the basis that plastic containers were used.[159] Even assuming, however, that samples of jet fuel kept in plastic containers even for short periods could yield unreliable test results, Torm has introduced no persuasive evidence to support its allegation that plastic containers in fact were used.[160]

**156.** Torm argues also that the test results from September 12 are not reliable evidence of the quality of the cargo loaded to the Vessel because it is industry practice to sample and test shore tanks immediately prior to the commencement of loading. Pl. Trial Mem. 13. That the analysis might not have followed industry practice is immaterial to its accuracy.

**157.** Based on the totality of the evidence presented in this matter, the Court finds that Durbridge's testimony is nothing more than blind advocacy in support of plaintiff's case. The most telling example of this is his "expert" opinion that the shore pipeline was not flushed prior to the second loading attempt. This view is based on a form filled out by Sluder which stated "Awaiting shore line flashing results," not: "awaiting shore line flushing results." DX CC. When asked whether this could have been a typographical error, after being faced with overwhelming evidence that the line indeed had been flushed, Durbridge's unrelenting adherence to the position favorable to plaintiff verged on the comical. Although he recognized that it could have been a typographical error, Durbridge stated "but I doubt it because its signed, [a] D–250 form." See Durbridge Dep. 85. Moreover, in his letter to Randall Grundy of Air Sea Containers, Durbridge wrote, "I am involved in a [sic] defending a complaint made against a vessel by the Charterers, the U.S. Military Sea Lift Command." PX 185. While perhaps simply semantics, this allusion to his role of advocate is consistent with the style of his report, with its excessive use of emphasis (capitalizing, bolding, italics and exclamation points), rhetorical questions and argumentative style. See PX 183. The Court finds his testimony to be utterly without probative value.

**158.** Durbridge attempted to explain how the shore line sample could have tested on-spec even assuming that the fuel it carried had an inordinate amount of particulate matter. He argued, in essence, that the particulate matter would settle to the bottom of the pipe line. Thus, if the line sample connection were located at the side or top of the line, the sample drawn would not contain the larger particles. PX 183 at 11. But this explanation is specious. First, Durbridge had no knowledge of the location of the line sample connection. Durbridge Dep. 52–53. Sluder, on the other hand, testified that the access points were on the bottom sides of the pipeline. Sluder Decl. 9. Second, if the particulate matter could settle that quickly, it would only make sense that the same would occur in the Vessel's cargo tanks. In light of the fact that the sampling point was not at the bottom of the tanks, see DX DDDDD, the contaminant, according to Durbridge's supposition, should have settled to the bottom and would not have been drawn out with the sample. But these samples all tested off-spec. The Court therefore rejects Durbridge's baseless supposition.

**159.** Pl. Trial Mem. 14.

**160.** The only evidence plaintiff offers is that seven of the samples sent to Inspectorate for testing were drawn by SGS Kuwait into plastic bottles. PX 183 (Durbridge Report) at 15; PX 105 (M–Scan sample receipt form) at 4. The samples to which Durbridge refers were marked collectively M–Scan No. 38740. PX 183 at 15; PX 105 at 4. According to the M–Scan sample receipt form, the seal on these samples was A610216. PX 105 at 4. This code shows up in SGS Kuwait's record of retained samples, which indicates that those bottles were used for *retain samples* of fuel from the Vessel's individual tanks. DX XXX; *see also* Brown Dep. 122; DX UUUUU, VVVVV.

This evidence does not demonstrate that the Vessel cargo tank samples tested at the KNPC

Finally, Torm argues that the Inspectorate Analysis demonstrates that the Cargo was not in good condition prior to its loading.[161] For the reasons discussed above, that analysis is not persuasive on this issue.

Having considered all of Torm's arguments, the Court finds that the Cargo was not contaminated until after it was loaded aboard the Vessel.

### Torm's Response

■ Torm seeks to avoid liability by availing itself of COGSA's due diligence defense[162] and the "q clause" exception mentioned above.[163] Inasmuch as Torm relies on the same evidence to establish both defenses, the Court considers these contentions together.

Under COGSA § 1304(1), "[n]either the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy."[164] Similarly, under the "q clause," liability will not lie for any damages resulting from any "cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier...." Torm bears the burden of proof on both defenses.[165]

Torm claims that its due diligence in presenting a seaworthy vessel is demonstrated by the fact that (1) the Vessel's cargo tanks were cleaned adequately prior to the first loading, (2) certain third party petroleum companies had approved the Vessel for cargo shipment, and (3) the Vessel had undergone regular maintenance and inspection. The evidence presented corroborates these claims.[166] The government's theory, however, is not that Torm tendered an unclean ship. Rather, it contends that the contaminants were introduced after the visual inspection of the cargo tanks but before the first foot samples were taken. The government suggests, in particular, that the contamination could have originated from a defective IGG, a theory this Court has found to be quite likely correct and one that Torm—which bears the burden here—has not disproved.[167] And it is not clear that the Vessel was suitably diligent in its operation and maintenance of the IGG.

The existence of problems with the IGG and the quality of the inert gas were known to the Vessel as demonstrated by the extensive repairs required by the system. The Vessel's several telexes to NOL indicate that it was aware also of the possibility that the IGG could contaminate the Cargo. In light of this knowledge, the Vessel should have taken all reasonable steps to eliminate the possibility of carbon soot entering the cargo tanks with the inert gas. But it has failed to prove that it did. Despite Kwang's instructions to inspect the combustion chamber after each

laboratory in October 1996 also were drawn into plastic bottles—the fact required for plaintiff's conclusion. That the SGS Kuwait surveyors drew some samples into plastic bottles does not mean that they drew all samples into plastic bottles; that the retain samples—marked M–Scan No. 38740—were in plastic bottles does not mean that the samples tested in October 1996 were too. And there is no evidence, as far as the Court can find, indicating that the samples analyzed by KNPC were drawn into plastic bottles.

161. Pl. Trial Mem. 9–10.

162. 46 U.S.C.App. § 1304(1).

163. *Id.* § 1304(2)(q).

164. *Id.* § 1304.

165. *See id.* § 1304(1), (2)(q).

166. The third party approvals of the Vessel, nonetheless, are irrelevant to the Court's determination whether Torm presented a suitable vessel.

167. The Court has determined that the Vessel contaminated the Cargo. It is plaintiff's burden to prove that it exercised due diligence in presenting a suitable vessel, which includes proving that it was diligent in providing an IGG that did not contaminate the Cargo.

use, the crew failed to do so after operating the IGG on September 15. Moreover, plaintiff has not proved that it made reasonable efforts to provide a properly working IGG. In addition, the evidence establishes also that the Vessel failed to flush the tanks and lines prior to the second loading, despite its inability to pass the first loading attempt inspection.

In the final analysis, the Court is not persuaded that Torm exercised due diligence in presenting a seaworthy vessel or that it was without fault or neglect which contributed to the damage of the Cargo.

### Avoidable Consequences

 Finally, Torm claims that even if it is responsible for the contamination, it is not liable for damages to the fuel loaded during the second attempt because the government forfeited its claim due to the doctrine of avoidable consequences, which "den[ies] recovery to the plaintiff for that portion of his loss that could have been avoided by his reasonable efforts."[168] That is, "'[a] tort defendant is not liable for consequences preventable by action that reason requires the plaintiff to take.... [T]he community's notions of fair compensation to an injured plaintiff do not include wounds which in a practical sense are self-inflicted.'"[169] It is Torm's burden to show that the government unreasonably failed to minimize its damages.[170]

Plaintiff argues, in relevant part, that the MSC proceeded to load the Cargo, knowing that the tanks had not been cleaned, despite Sluder's recommendation to the MSC that the Vessel clean its cargo tanks before the second loading attempt. The government rejoins that Taylor believed that flushing would have been adequate to rid the cargo tanks of the contaminant and was under the impression that the Vessel had flushed.[171] It therefore was not unreasonable, the government argues, to load only a small portion of the Cargo on board as an initial test to "ascertain whether or not the vessel had eliminated the contaminant problem."[172]

Taylor believed that flushing the lines and tanks would dislodge any contaminants present, thereby avoiding damage to the cargo. He instructed the Vessel to do so and believed that it had followed his direction. This was a perfectly reasonable course of action. Torm in any case has failed to prove that it was not. In consequence, Torm has not proved that the government acted unreasonably in respect of the second attempted loading, and defendant is entitled to its full damages.

### Conclusion

For the foregoing reasons, judgment will enter in case No. 97 Civ. 7518 declaring that the defendant was entitled to cancel the Contract. Judgment will be entered dismissing the complaint in case No. 98 Civ. 0393. In case No. 98 Civ. 4087, judgment shall be in favor of the defendant and against plaintiff in the amount of $17,686.26, representing defendant's damages less the $66,251.73 it owes plaintiff in demurrage involving the TORM LILLY, together with interest thereon at the rate of

---

**168.** *Federal Ins. Co. v. Sabine Towing & Transportation Co., Inc.,* 783 F.2d 347, 350 (2d Cir.1986) (citing *Southport Transit Co. v. Avondale Marine Ways, Inc.,* 234 F.2d 947, 951–54 (5th Cir.1956)).
Though a carrier normally has responsibility for loading cargo, that rule does not apply where the charterer assumes the responsibility for loading. *See Nichimen Co. v. M/V Farland,* 462 F.2d 319, 331 (2d Cir.1972). Inasmuch as the parties proceed under the assumption that the government assumed the responsibility for loading the Cargo. the Court does the same.

**169.** *Id.* (quoting *Ellerman Lines, Ltd. v. The President Harding,* 288 F.2d 288, 290 (2d Cir. 1961)).

**170.** *Id.*

**171.** Taylor Decl. 7–9; DX V.

**172.** Def. Reply Trial Mem. 22.

5 percent [173] from October 10, 1996 to the date of the judgment.

SO ORDERED.

**173.** In an admiralty case in this Circuit, "the rate of interest used in awarding prejudgment interest rests firmly within the sound discretion of the trial court." *Transatlantic Marine* *Claims Agency, Inc. v. M/V "OOCL Inspiration",* 137 F.3d 94, 104 (2d Cir.1998) (internal quotation marks and citations omitted).